MEAT CUTTERS UNION LOCAL 81 OF
the AMALGAMATED MEAT CUTTERS
AND BUTCHER WORKMEN OF
NORTH AMERICA, AFL–CIO, Peti-
tioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Safeway Stores, Intervenor.

No. 24709.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 5, 1971.

Decided Jan. 25, 1972.

Mr. John E. Rinehart, Jr., Seattle, Wash., with whom Mr. Hugh Hafer, Seattle, Wash., was on the brief, for petitioner.

Mr. Herbert Fishgold, Atty., National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac

vice by special leave of court, with whom Messrs. Arnold Ordman, Gen. Counsel at the time the brief was filed, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, were on the brief, for respondent. Mr. Daniel M. Katz, Atty., National Labor Relations Board, also entered an appearance for respondent.

Mr. J. Tyler Hull, Seattle, Wash., for intervenor.

Before MacKINNON and WILKEY, Circuit Judges, and FRANK M. JOHNSON, Jr.,* Chief Judge, U.S. District Court for the Middle District of Alabama.

MacKINNON, Circuit Judge:

The National Labor Relations Board (N.L.R.B.) found that Meat Cutters Union Local 81, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, hereinafter referred to as the Union, violated section 8(b) (1) (B) of the National Labor Relations Act, as amended,[1] by fining, and expelling from membership, one Hall, a supervisor, for acts he had performed in the course of his management duties for Safeway Stores, Inc., hereinafter sometimes referred to as the Company or the Employer.[2] The Labor Board decided that this imposition of Union discipline restrained and coerced the Company in the selection of its representative for the adjustment of grievances and the Union has appealed this determination. We affirm, and grant the Board's cross-petition for enforcement of its order.

The relevant facts are not in dispute. Safeway Stores, Inc., operates a number of retail stores in the Seattle, Washington area, including one in Bothell, Washington, with which we are herein concerned, which contain meat markets in which meat products are cut, packaged, priced, displayed, and sold, at retail. The Company also operates a meat products warehouse at Bellevue, Washington, where bulk meats are reduced to smaller cuts and otherwise processed, before being shipped to the Safeway stores in the Seattle area for retail sale through their respective meat departments.

The retail meat market employees of Safeway in the Seattle area have been covered by contracts between the Union (Local 81) and Allied Employers, Inc., which represents Safeway and other retail food chains in the Seattle region in negotiating and administering collective bargaining agreements. The applicable contract here covered the managers of the meat departments at area Safeway retail stores, and it required them, along with all other meat market personnel covered by the agreement, to become and remain members of the Union as a condition of continued employment.[3] Supervisor Hall,[4] who manages the meat

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c) (1970).

1. 29 U.S.C. § 158(b) (1) (B) (1970) provides:
    (b) It shall be an unfair labor practice for a labor organization or its agents—
    (1) to restrain or coerce . . .
    (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances;

2. Meat Cutters Union Local 81, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, 185 NLRB No. 130, 1970 CCH NLRB ¶ 22,356 (1970).

3. The Union has conceded that by agreeing to the contract provision requiring meat market managers to be Union members, Safeway did not thereby waive or lose its right to the protection of section 8(b) (1) (B) of the Act. *Brief for the Union* at 20.

4. Hall had authority to prepare work schedules, assign duties, and recommend the hiring, promotion, and discharge of the half-dozen employees in the Bothell store retail meat market, and, as the Union acknowledged, he had the power to adjust and to effectively recommend the adjustment of grievances raised by the employees under his supervision. He was, therefore, in addition to being one of the Company's representatives for the adjustment of grievances within the meaning of section 8(b) (1) (B), a "supervisor" within the meaning of section 2(11)

market in the Employer's Bothell store, was a full Union member at the time he performed the tasks for which he was disciplined by the Union.

Prior to July of 1968, the processes of fine-grinding meat (for hamburger, etc.) and slicing liver in preparation for sale were performed by Union employees at the Company's respective retail meat markets. In July of 1968, however, Safeway notified the managers of its retail meat markets, including Hall, all of whom possessed the authority to order meat products for the meat departments under their supervision, that, thereafter, the fine-grinding and liver-slicing operations would no longer be performed in the retail stores. The managers were directed henceforth to fill their market needs for those products by ordering them in prepared form from the Bellevue warehouse.[5] Subsequently, the Union notified the Company of its opposition to the new procurement policy, contending that it violated the collective bargaining agreement.[6] The Union also informed its members, including the managers of the meat markets, of its position, and it directed them not to follow the Company's new policy. Supervisor Hall was aware of the Union's strong opposition to the newly instituted procurement program, but he continuously

acted in accordance with his Employer's directions by ordering sliced liver and fine-ground meat from the Bellevue warehouse.[7]

In December of 1968, after affording him an opportunity to appear before its Executive Board to answer a charge of procuring fine-ground meat and sliced liver from the Bellevue facility, the Union fined Hall $50.[8] Subsequently, in early April of 1969, further disciplinary proceedings were brought against Hall, due to his continued adherence in meat procurement to the Company's policy. These proceedings resulted in Hall's expulsion from the Union and caused him a consequent loss of his rights to the sick and death benefits appurtenant to Union membership. The President of the International Meat Cutters Union affirmed the Union's disciplinary action regarding Hall, and the Union has since refused to accept any dues tendered by him. An 8(b) (1) (B) charge was thereafter filed with the N.L.R.B.

The Labor Board concluded that the Union's fining and expulsion of Hall due to his performance of his managerial duty to follow the Company's meat procurement directive, constituted an 8(b) (1) (B) violation, and it issued a cease and desist order. The Board also affirmatively ordered the Union to rescind

of the N.L.R.A., 29 U.S.C. § 152(11) (1970). As such, he was excluded from "employee" status by the express language of section 2(3) of the Act, 29 U.S.C. § 152(3) (1970), which defines "employee." See note 15, infra.

5. Bellevue, Washington, is within the territorial area over which the Union asserts jurisdiction, but the employees of the Bellevue meat products warehouse are represented by Local 186 of the same Meat Cutters International Union.

6. Although the applicable collective bargaining contract provided that "[a]ll matters pertaining to the proper application and interpretation of any and all provisions of this Agreement shall be adjusted by the accredited representative of the Union" and that in the event of a failure to reach a satisfactory adjustment within 15 days "the matter shall be referred for final adjustment to a Labor Relations Committee (selected as provid-

ed for in the contract)," the Union initially chose to forego this procedure. It was only after it had fined and expelled Supervisor Hall that the Union agreed to submit the underlying claim of contract breach to the grievance-arbitration procedures.

7. It was estimated that the change in the Company's meat procurement policy would have the effect of transferring work equivalent to that of 7 or 8 journeymen employed on the basis of a 40-hour week from the retail market personnel represented by the Union (Local 81) to employees at the Bellevue facility represented by Local 186 of the same International Meat Cutters Union.

8. In March of 1969, the Union imposed an additional $10 fine on Hall due to his failure to appear, as requested, before the Union Executive Board to explain his continuing meat procurement conduct.

the disciplinary action taken against Hall, to expunge all references. thereto from its records, to reinstate Hall to membership and to give retroactive effect to all sick, death, or other monetary benefits appurtenant to such membership that may have become payable since his improper expulsion.

## I

■ Section 8(b) (1) (B) of the National Labor Relations Act, as amended (hereafter the Act),[9] prohibits a union from restraining or coercing an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances. Since Supervisor Hall concededly possessed the authority to adjust the grievances of the employees working under his direction at the time the Union imposed the complained of discipline, it is clear that he was then a representative of the Company for "the adjustment of grievances" within the meaning of section 8(b) (1) (B). Therefore, we must determine whether the fining and expulsion of Hall by the Union constituted "restraint or coercion" of his Employer in the selection of its representative.

■ "In enacting section 8(b) (1) (B) Congress sought to prevent . . . union interference with an employer's control over its own representatives." San Francisco-Oakland Mailers Union

No. 18, I.T.U., 172 NLRB No. 252, 1968-2 CCH NLRB ¶ 20,195 (1968), at p. 25,347.[10] Congress recognized that prior to the passage of the Taft-Hartley Act amendments to the National Labor Relations Act in 1947, many unions had "taken it upon themselves to say that management should not appoint any representative who [was] too strict with the membership of the union," and through the enactment of Section 8(b) (1) (B) it endeavored "to prescribe a remedy in order to prevent such interferences." [11] While this provision obviously proscribed *direct* restraint or coercion against an employer itself, it is clear that Congress also intended to prohibit *indirect* interference accomplished through the imposition of union discipline on an employer's representantives. *See* San Francisco-Oakland Mailers Union No. 18, I.T.U., *supra*, 172 NLRB No. 252, 1968-2 CCH NLRB at p. 25,347; N.L.R.B. v. Sheet Metal Workers, Local 49, 430 F.2d 1348 (10th Cir.1970); N. L.R.B. v. Toledo Locals Nos. 15-P and 272 of the Lithographers and Photo-Engravers International Union, 437 F.2d 55 (6th Cir.1971); New Mexico District Council of Carpenters, 177 NLRB No. 76, 1969 CCH NLRB ¶ 21,037 (1969).

■■ The Union in the instant case fined and expelled Supervisor Hall in retaliation for his performance of duties indigenous to his position as a management representative.[12] He was disci-

9. 29 U.S.C. § 158(b) (1) (B) (1970). *See* note 1, *supra*.

10. Section 8(b) (1) (B) is, to a large degree, the correlative of the Section 7 guarantee to employees of the right "to bargain collectively through representatives of their own choosing." *See* 29 U. S.C. § 157 (1970).

Section 7 of the National Labor Relations Act . . . guarantees certain rights to employees, including the right . . . "to bargain collectively through representatives of their own choosing." This right of employees and the corresponding right of employers, see section 8(b) (1) (B) of the Act, . . . to choose whomever they wish to represent them in formal labor negotiations is fundamental to the statutory scheme. In general, either

side can choose as it sees fit and neither can control the other's selection . . . General Electric Co. v. N. L. R. B., 412 F.2d 512, 516 (2nd Cir. 1969).

11. II Legislative History of the Labor Management Relations Act, 1947 (N.L. R.B. 1948) [hereafter "Legislative History"], p. 1077 (comments of Senator Ellender). *See* S.Rep.No.105, 80th Cong., 1st Sess., p. 21, I Legislative History at 427; II Legislative History at 1524 (comments of Senator Ball).

12. Although the Union asserts that the Labor Board has improperly adopted a *per se* approach, whereby it invalidates any and all union discipline imposed upon a member who happens to be a company "supervisor," we believe the Union contention is erroneous at least insofar

plined as a result of his managerial decision to implement a new Company meat-procurement policy. He merely complied with a Safeway order that was directed to the managers of all of its meat markets in the Seattle area. Had Hall, as supervisor, refused to carry out these orders as directed by his Employer, he certainly would have been subject to Company discipline, and there would have been serious doubt thereafter as to whether he could represent the Company in a *bona fide* manner against the Union in other matters where their interests were adverse. Under these circumstances, it is obvious that the Union's actions were impermissibly designed "to change [the Company's] representative from one representing the viewpoint of management to a person responsive or subservient to the Union's viewpoint . . . ." N.L.R.B. v. Sheet Metal Workers, Local 49, 430 F.2d 1348, 1350 (10th Cir.1970). *See* San Francisco-Oakland Mailers Union No. 18, I.T.U., *supra*, 172 NLRB No. 252, 1968–2 CCH NLRB at p. 25,347; New Mexico District Council of Carpenters, 177 NLRB No. 76, 1969 CCH NLRB ¶ 21,037 (1969); Dallas Mailers Union, Local 143 v. N.L.R.B., 144 U.S.App.D.C. 254, 445 F.2d 730, 735 (1971). The "conduct of the union could very well be considered as an endeavor to apply pressure on the supervisory employees of the [Company], and

to interfere with the performance of the duties which the employer required them to perform . . ., and to influence them to take action which it, the employer, might deem detrimental to its best interests. This conduct of the union would further operate to make the employees reluctant in the future to take a position adverse to the union, and their usefulness to their employer would thereby be impaired." N.L.R.B. v. Toledo Locals Nos. 15–P and 272 of the Lithographers and Photo-Engravers International Union, *supra*, 437 F.2d at 57. Although this decision might easily terminate at this point by affirming the decision of the Labor Board,[13] we shall discuss several additional contentions which have been advanced by the Union in support of its position.

## II

The Union notes that in section 14(a) of the Act,[14] Congress expressly provided that "supervisors" may become and remain union members, and it argues that this indicates an intention to subject such persons to the full control of the union in which they enjoy membership. We cannot accept this narrow reasoning. Section 14(a) must not be examined in isolation, but rather, it must be considered in concert with section 8(b) (1) (B) and the portion of section 2(3) [15] which expressly excludes

---

as it refers to this case. The rule here applied by the Board only affects union discipline which is imposed upon a member, who has responsibilities as a representative of his employer in administering the collective bargaining agreement or the adjustment of employee grievances, because he has performed duties as a management representative. *See* Meat Cutters Union Local 81, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, 185 NLRB No. 130, 1970 CCH NLRB ¶ 22,356 (1970), at p. 28,846. The N.L.R.B. has made it clear that a union may legally discipline a supervisor-member for acts which are *not* performed by the individual in furtherance of his obligations as the employer's representative. *See, e. g.,* Painters Local 453, 183 NLRB No. 24, 74 LRRM 1539 (1970).

13. Even the Union has conceded that if its "primary objective was to affect the member in his status as a supervisor or representative of management, then the employer should prevail." *Brief for the Union* at 21.

14. 29 U.S.C. § 164(a) (1970) provides:
   (a) Nothing herein shall prohibit any individual employed as a supervisor from becoming or remaining a member of a labor organization, but no employer subject to this subchapter shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law, either national or local, relating to collective bargaining. The term "supervisor" is defined in Section 2(11) of the N.L.R.A., 29 U.S.C. § 152(11) (1970).

15. 29 U.S.C. § 152(3) (1970) provides, *inter alia*: "The term 'employee' shall

"supervisors" from the statutory definition of "employee." It is extremely informative to examine our previous analysis of the congressional purpose in enacting the exclusionary part of section 2(3) pertaining to supervisors and the companion provision, section 14(a), in 1947:

> Congress was aware of the potential conflict between the obligations of foremen as representatives of their employers, on the one hand, and as union members, on the other. Section 2(3) evidences its *intent to make the obligations to the employer paramount.* That provision excepts foremen from the protection of the Act. Its purpose was to give the employer a free hand to discharge foremen as a *means of ensuring their undivided loyalty, in spite of any union obligations.* See H.Rep.No.245, 80th Cong., 1st Sess. 14–17 (1947); S.Rep.No.105, 80th Cong., 1st Sess. 3–5 (1947); L. A. Young Spring & Wire Corp. v. National Labor Relations Board, 1947, 82 U.S.App.D.C. 327, 163 F.2d 905, certiorari denied 1948, 333 U.S. 837, 68 S.Ct. 607, 92 L.Ed. 1121 . . .[16]

While section 14(a) permits supervisors to be union members, it is readily apparent, when all of the relevant 1947 amendments to the Act are considered in concert, that Congress did not intend thereby to allow unions to subvert the "undivided loyalty" it clearly believed such managerial personnel owe to their respective employers. A supervisor's obligations to his union simply cannot detract from the absolute duty, evidenced by section 8(b) (1) (B), which he owes to his employer when exercising his managerial authority. To hold to the contrary would be tantamount to depriving management of the power to manage.

■ The Union next argues that its conduct here is protected legitimate union activity within the meaning of N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U. S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), and Scofield v. N. L. R. B., 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), but we do not believe that these cases are applicable to cases involving facts such as are present here. Those cases, unlike the present one, concerned the scope of section 8(b) (1) (A) of the Act and the Supreme Court, in finding lawful the union action involved in *Allis-Chalmers,* and subsequently in *Scofield,* relied in part on the *proviso* to section 8(b) (1) (A),[17] which provides that the right of a labor organization to prescribe its own rules with respect to the acquisition and retention of union membership shall not be impaired. However, the applicability of that *proviso* is clearly limited to section 8(b) (1) (A), which regulates the union-employee

---

include any employee . . . , but shall not include . . . any individual employed as a supervisor . . . " *See* note 4, *supra.*

16. Carpenters District Council of Milwaukee etc. v. N. L. R. B., 107 U.S.App.D.C. 55, 57, 274 F.2d 564, 566 (1959) (emphasis supplied).

> During the 1947 debates, Senator Ball stated:
> Foremen are an integral part of management and are so regarded now in the law. [By the Section 2(3) exclusionary provision] But the NLRB has also held that they can at the same time be subject to the discipline of the unions of employees they supervise, which just doesn't make sense.
> II *Legislative History* at 1524.

17. 29 U.S.C. § 158(b) (1) (A) (1970) provides:

> (b) It shall be an unfair labor practice for a labor organization or its agents—
> (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein;

*See* N. L. R. B. v. Allis-Chalmers Mfg. Co., *supra,* 388 U.S. at 191–192, 87 S.Ct. 2001; Scofield v. N. L. R. B., *supra,* 394 U.S. at 428, 89 S.Ct. 1154.

relationship. It is not a part of section 8(b) (1) (B) which basically affects only the union-employer relationship.[18]

■ An additional consideration distinguishes *Allis-Chalmers* and *Scofield* from the instant case. Only legitimate *internal union affairs* are protected under the rationale of those decisions.[19] The primary relationship affected in *Allis-Chalmers* and *Scofield* was the one between the unions and their members. In contrast, the relationship primarily sought to be affected in the present case, was the one between the Union and the Company, since the underlying issue was the interpretation of the collective bargaining agreement between the parties—i.e., the Union claimed that the new Company meat procurement policy violated the contract. The relationship between the Union and its member appears to have been of only secondary importance, used as a convenient, and it would seem, powerful tool to affect the Employer-Union relationship, by compelling the Company's supervisor to adopt a pro-Union position contrary to the express position of his Employer. The purpose[20] of the Union's conduct literally and directly contravened the statutory policy evidenced in section 8(b) (1) (B) which sought to guarantee to the Company an unimpeded choice of representatives for collective bargaining and the settlement of employee grievances. Therefore, the Union's disciplinary action was outside the sphere of legitimate internal union activity which the Supreme Court sanctioned in the *Allis-Chalmers* and *Scofield* decisions.[21]

■ The Union finally contends that since its action had the objective of preserving bargaining unit work, it was permissible under the Act. However, while it is well recognized that the preservation of unit work is a legitimate union goal,[22] a labor organization is clearly not free to utilize any means it chooses in order to achieve a desired result. In the instant case, the Union claimed that the new Company meat procurement policy, compliance with which led to the im-

18. *See* San Francisco-Oakland Mailers Union No. 18, I.T.U., 172 NLRB No. 252, 1968–2 CCH NLRB ¶ 20,195 (1968), at p. 25,348; Price v. N. L. R. B., 373 F.2d 443, 446 (9th Cir. 1967), cert. denied, 392 U.S. 904, 88 S.Ct. 2051, 20 L. Ed.2d 1363 (1968). *See also* II *Legislative History* at 1139, 1141, 1200.

19. N. L. R. B. v. Allis-Chalmers Mfg. Co., *supra*, 388 U.S. at 185–187, 195, 87 S.Ct. 2001; Scofield v. N. L. R. B., *supra*, 394 U.S. at 428, 89 S.Ct. 1154. *See* N. L. R. B. v. Sheet Metal Workers, Local 49, 430 F.2d 1348, 1350 (10th Cir. 1970); N. L. R. B. v. Toledo Locals Nos. 15–P and 272 of the Lithographers and Photo-Engravers International Union, AFL-CIO, 437 F.2d 55, 57 (6th Cir. 1971); New Mexico District Council of Carpenters, 177 NLRB No. 76, 1969 CCH NLRB ¶ 21,037 (1969).

20. The fact that the Union's coercive conduct did not achieve the apparent result sought—as evidenced by the fact that Supervisor Hall continued to adhere to the Company policy despite the Union's disciplinary efforts—does not detract from its illegality under section 8(b) (1). [I]n determining whether a § 8(a) (1) or § 8(b) (1) violation has been committed, the answer does not "turn on

* * * whether the coercion succeeded or failed * * * the test is whether the employer [Union] engaged in conduct which, it may be reasonably said, tends to interfere with the free exercise of [the rights protected under the Act]." N. L. R. B. v. Illinois Tool Works, 153 F.2d 811, 814 . . .
Local Union No. 167, Progressive Mine Workers of America v. N. L. R. B., 422 F.2d 538, 542 (7th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2198, 26 L.Ed.2d 560 (1970). *See* Progressive Mine Workers of America etc. v. N. L. R. B., 187 F.2d 298, 301 (7th Cir. 1951).

21. *See* Scofield v. N. L. R. B., *supra*, 394 U.S. at 429–430, 432, 89 S.Ct. 1154; N. L. R. B. v. Industrial Union of Marine etc., Workers, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); District 50, Local 12419, 176 NLRB No. 25, 71 LRRM 1311 (1969).

22. *See* National Woodwork Mfgrs. Assn. v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). *See also* Local 24, International Brotherhood of Teamsters, Chauffeurs, etc. v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

position of Union discipline on Supervisor Hall, was established in violation of the collective bargaining agreement. Although that same agreement expressly provided for the resolution of such conflicts through the use of the contract's grievance-arbitration procedures, the Union sought to enforce its interpretation upon management unilaterally through the exercise of its internal disciplinary authority upon supervisory personnel.[23] Such action not only contravened the specific statutory policy expressed in section 8(b) (1) (B) of the Act, as we have already noted, but it also controverted the generally recognized federal labor policy favoring the peaceful, bi-party resolution of such contract disputes through resort to the arbitration process. *See* Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 241, 243, 252, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). It is therefore clear that the Union cannot vitiate the illegality of its conduct by resort to the work preservation doctrine. *See* Dallas Mailers Union, Local 143 v. N. L. R. B., *supra,* 144 U.S.App.D.C. at 259, 445 F.2d at 734–735.

■ We accordingly affirm the finding of the Labor Board that the Un-

23. Only *after* the Union had fined and expelled Hall did it finally agree to submit the contract dispute to arbitration.

24. It is clear that the Board's remedial order is within the broad discretion it is permitted under Section 10(c) of the Act, 29 U.S.C. § 160(c) (1970). *See* Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Virginia Electric & Power Co. v. N. L.

ion violated section 8(b) (1) (B), and the Board's cross-petition for enforcement of its order [24] is hereby

Granted.

R. B., 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 215–217, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); Amalgamated Clothing Workers of America v. N. L. R. B., 125 U.S.App.D.C. 275, 281, 371 F.2d 740, 746 (1966); Office and Professional Employees International Union, Local 425 v. N. L. R. B., 136 U.S.App.D.C. 12, 19–20, 419 F.2d 314, 321–322 (1969).