INTERNATIONAL UNION OF ELEVA-
TOR CONSTRUCTORS LOCAL
UNION NO. 8, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD.

No. 80–1692.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 26, 1981.

Decided Sept. 11, 1981.

Brian A. Powers, Washington, D. C., with whom Donald J. Capuano, Washington, D. C., Victor Van Bourg and David Rosenfeld, San Francisco, Cal., were on brief, for petitioner.

Peter Winkler, Atty., N. L. R. B., Washington, D. C., with whom John G. Elligers and Christopher W. Katzenbach, Attys., N. L. R. B., Washington, D. C., were on brief, for respondent.

Laurence J. Cohen and Victoria L. Bor, Washington, D. C., were on brief for amicus curiae Bldg. and Const. Trades Dept., AFL–CIO, urging reversal.

Before MacKINNON, MIKVA and GINS-BURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

This case involves a troublesome conjunction of a union constitutional requirement and a clause in the collective bargaining agreement between the union and employer. The union constitution requires members to pay fines before dues; the collective bargaining agreement contains a union security clause requiring the employer to fire any employee who fails to join and maintain membership in the union. The National Labor Relations Act (the "Act") allows union security clauses, but not as a means to collect fines. The National Labor Relations Board (the "Board") found that the conjunction of these two requirements coerced employees in violation of Section 8(b)(1)(A) of the Act, 29 U.S.C. § 158(b)(1)(A) (1976), and ordered the union to delete the clause from its constitution. We grant enforcement of the Board's order.

## I. THE FACTUAL BACKGROUND

The International Union of Elevator Constructors (the "International") and the national elevator industry have for a number of years negotiated a union security clause in their collective bargaining agreement. The clause requires all covered mechanics and helpers to join the union within thirty days of employment. Employers must dismiss employees who lack the required membership, unless they have reasonable grounds for believing membership was unavailable to the employee on generally available terms or was denied for reasons other than failure to pay dues or initiation fees.[1]

James Finney, an employee of the San Francisco Elevator Company (the "employer") covered under the union security clause, is a member of Local No. 8 of the International Union (the "Local"). After a dispute at a meeting of the Local, Finney was charged by the Local's Business Manager with violating the International constitution by attempting to override a union official's decision to deny attendance cards to several disorderly members. A regional hearing panel of the International fined Finney $2000, ordered his removal from the Local executive board, and permanently banned him from union office. The International General Executive Board modified the penalty to a $1000 fine and one-year ban. The letter from the Local's Business Manager informing Finney of the modified penalty concluded with a reminder that "Article XI, Section 3 of Local 8's By-Laws states that all fines imposed . . . shall stand and be payable before dues. Your next quarter dues are due and payable December 31, 1977." Joint Appendix ("J.A.") at 30.

Finney did not pay the fine, but paid regular dues in December 1977, March 1978, May 1978 and September 1978. The Local accepted the payments and did not credit them against the fine. No action was taken to collect the fine and no suggestion was made that the unpaid fine would affect Finney's job. Indeed, the Local appears to have ignored the uncollected fine altogether. J.A. 31.

Nevertheless, Finney filed an unfair labor practice charge under 29 U.S.C. § 160(b) (1976) on January 10, 1978. The Regional Director, acting on behalf of the General Counsel, issued a complaint charging that the Local had violated Section 8(b)(1)(A) by maintaining the bylaw requiring payment of fines before dues in conjunction with the union security clause, and by disciplining Finney in order to deprive him of the right to participate fully in internal union affairs. The basis for the second charge was Finney's allegation that the Business Manager of the Local did not like him because Finney had opposed him in union elections.

---

1. The exact language of the union security clause is as follows:

   All Mechanics and Helpers covered by this agreement shall, as a condition of employment obtain and maintain membership in a local union of the International Union of Ele-

vator Constructors on and after the thirtieth (30th) day following the beginning of their employment.

Standard Agreement, Art. III, ¶ 1; Joint Appendix ("J.A.") at 83. Identical clauses were negotiated in 1972 and in 1977.

The complaint was tried before an administrative law judge on August 22, 1978. The judge ruled against the Local on both counts, finding that the conjunction of the union security clause and the payment of fines requirement (the "fines payable bylaw") coerced employees in violation of Section 8(b)(1)(A) and that the disciplinary action against Finney was a pretext disguising a union political struggle. J.A. 39. The Local filed exceptions to the administrative law judge's ruling. The Board found the evidence insufficient to sustain the charge that the disciplinary actions against Finney were improperly motivated. In a footnote, however, the Board agreed that the fines payable bylaw in conjunction with the union security clause was an unfair labor practice: "We agree with the finding of the Administrative Law Judge that Respondent violated Sec. 8(b)(1)(A) by maintaining art. XI, sec. 3, of its constitution and bylaws which, in essence, provides that all fines and assessments have to be paid by members before dues." J.A. 9. Pursuant to 29 U.S.C. § 160(c) (1976), the Board ordered the Local to abolish the fines payable bylaw.

When the Local moved for reconsideration, the Board denied the motion but amplified its reason for finding the violation. The Board held that while a union has a legitimate interest in collecting fines, and while union security provisions which condition continued employment on the payment of union initiation fees and dues are legal, employment pressure may not be used to collect union fines. The fines payable bylaw, the Board found, constituted just such illicit pressure when coupled with a union security clause in the collective bargaining agreement:

Employees, knowing that their payment of dues is conditioned on prior payment of any fines and assessments owed, can reasonably assume that they must make all of those payments in order to avoid the risk that Respondent will seek their discharge. The Act does not require them to take the risk in order to test the validity of their assumption, nor does it permit Respondent to threaten action indirectly which it cannot threaten directly.

. . . The implicit threat imposed by the coordinated operation of [petitioner's] rule and a union-security clause is an actual threat. No more explicit coercion is necessary to find a violation of Section 8(b)(1)(A).

J.A. 4–5 (citations omitted). Member Truesdale dissented, arguing that the panel had failed to articulate a rationale for finding the fines payable bylaw an implicit threat: "It seems to me a long leap in logic to conclude that a rule that says *nothing* about the employment relationship nevertheless impliedly threatens the employees' employment and, for that reason, is a *per se* violation of the Act." J.A. 7 (citation omitted).

The Local petitions for review under 29 U.S.C. § 160(f) (1976). The Board cross-appeals for enforcement of its order.

## II. ANALYSIS

*The Union Security Clause.* Union security clauses enforce the union shop by authorizing the discharge of employees who fail to obtain union membership. Their purpose is to require employees who benefit from union activity to share the financial burdens. The union shop was specifically authorized in the Taft-Hartley Act, Title I, § 101, 61 Stat. 140 (1947), 29 U.S.C. § 158(a)(3) (1976). Union security clauses tracking exactly the language of the Act, such as the one here, are clearly valid. *See, e.g., National Lead Co., Titanium Division,* 106 NLRB 545 (1953).

The union membership obligations enforceable by discharge under a union security clause, however, include only the "financial core" of dues and initiation fees.[2] In particular, unions may not affect an employee's job status for failure to pay fines

---

2.  *NLRB v. General Motors Corp.*, 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963); *United Stanford Employees, Local 680, Service Employees International Union, AFL–CIO v.* NLRB, 601 F.2d 980 (9th Cir. 1979); *Local Union No. 749, International Brotherhood of Boilermakers v. NLRB*, 466 F.2d 343 (D.C.Cir. 1972).

or to adopt a union dues checkoff system.[3] There is no dispute that any threats to discharge Finney for nonpayment of his fines would therefore be clear violations of Section 8(b)(1)(A) of the Act. The Local contends that since no threats were made, the mere existence of the fines payable bylaw is not enough to trigger this Section.

*The Fines Payable Bylaw.* The Board found that the combination of the fines payable bylaw with the union security clause posed just such an impermissible threat, even in the absence of overt threats to cause Finney to be fired. The Local raises these objections to the Board's conclusions: The fines payable bylaw was merely a valid union rule, shielded by the proviso to Section (8)(b)(1)(A) that unions may set membership requirements; in finding coercion in this case, the Board may not rely on a presumption that the union will act illegally in enforcing its rules or the possibility that employees will misinterpret a clearly valid contractual provision; and the Board exceeded its powers under the Act by adopting a *per se* rule in this case. We discuss these points in order.

Section 8(b)(1) forbids unions to "restrain or coerce" employees in their right to eschew union activity. 29 U.S.C. § 158(b)(1) (1976). It is qualified by the proviso "[t]hat this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership." *Id.* § 158(b)(1)(A). This proviso has been interpreted to allow enforcement of union rules with a legitimate purpose, which do not conflict with national labor policy, so long as members are free to escape union discipline by resignation.[4] For example, unions may discipline members who cross picket lines during a lawful strike, who are disorderly or disrupt union grievance procedures, or who undermine union efforts to enforce negotiated production limits.[5] The union bylaw at issue here—that fines are payable before dues—has the legitimate purpose of encouraging members to pay fines and, considered independently, would clearly be protected by the proviso. The Board drew this conclusion in *National Lead Co., Titanium Division,* 106 NLRB 545 (1953), and continues to uphold fines payable bylaws in the absence of a valid union security clause.[6]

---

3. For discussions of fines, *see, e.g., NLRB v. Spector Freight System, Inc.,* 273 F.2d 272 (8th Cir. 1960); *Longshoremen's & Warehousemen's Union, Local 13 (Pacific Maritime Assoc.),* 228 NLRB 1383 (1977), enforced, 581 F.2d 1321 (9th Cir. 1978), cert. denied, 440 U.S. 935, 99 S.Ct. 1279, 59 L.Ed.2d 493 (1979). For discussions of dues check-off requirements, *see, e.g., Local 4012, Communications Workers of America (Michigan Bell Tel. Co.),* 184 NLRB 166 (1970); *International Union of Electrical, Radio & Machine Workers, Local 601 (Westinghouse Elec. Corp.),* 180 NLRB 1062 (1970); *Metal Workers' Alliance, Inc. (TRW Metals Division, TRW, Inc.),* 172 NLRB 815 (1968).

4. *Scofield v. NLRB,* 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123; *Charles E. Helton v. NLRB,* 656 F.2D 883, at 894 (D.C.Cir.1981); *New York City Taxi Drivers Union, Local 3036, AFL–CIO (Taxi Maintenance Corp.),* 231 NLRB 965 (1977).

5. Examples of union disciplinary rules which conflict with national labor policy and may not be enforced by union discipline include requirements that members exhaust internal union remedies before complaining to the Board,

*NLRB v. Industrial Union & Marine & Shipbuilding Workers,* 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968); *International Brotherhood of Teamsters (Red Ball Motor Freight),* 191 NLRB 479 (1971); *Operative Plasterers' & Cement Masons' International Assoc. (Arthur G. McKee),* 189 NLRB 553 (1971); *Local 138, International Union of Operating Engineers (Charles S. Skura),* 148 NLRB 679 (1964), limits on employee free speech within the union, *Charles E. Helton v. NLRB,* 656 F.2d 883 (D.C. Cir.1981); *International Union of Operating Engineers Local 400, AFL–CIO (Hilde Construction Co.),* 225 NLRB 596 (1976), and limits on employee political activity within the union, *Shenango, Inc.,* 237 NLRB 1355 (1978); *Carpenters Local No. 22, United Brotherhood of Carpenters & Joiners of America, AFL–CIO,* 195 NLRB 1 (1972).

6. *Teamsters Local 980 (Neilson Freight Lines, Inc.),* 249 NLRB 46 (1980). This case involved a fines payable bylaw in the context of a hiring hall agreement under which workers were dispatched without regard to union membership. The Board viewed the absence of a union security clause as crucial in distinguishing its decision on petition for review here.

In this case, however, we are not faced with an independently valid fines payable bylaw, but with such a bylaw juxtaposed with a union security clause in the collective bargaining agreement. The union rules proviso has been consistently interpreted to insulate employees' job security from unions' rights to self government. Courts have therefore insisted upon careful separation of "internal" union discipline from "external" threats to employment status. *Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1966); *International Longshoremen's and Warehousemen's Union, Local 13 (Pacific Maritime Assoc.)*, 228 NLRB 1383 (1977), *enforced*, 581 F.2d 1321 (9th Cir. 1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1279, 59 L.Ed.2d 493 (1979). The Board found here that with the addition of the union security clause the Local had crossed the line from a valid bylaw to impermissible "external" coercion. The Local's contention that the bylaw has a legitimate purpose, Brief for Petitioner at 23–26, does not, therefore, squarely meet the problem before us.

The Local concedes that overt threats to Finney's job status under the fines payable bylaw would have been clear violations of the Act. (Brief for Petitioner at 8). It argues, however, that since no action was taken against Finney beyond the initial letter reminding him of the bylaw, the Board acted improperly in finding the external coercion requisite for a violation of the Act.

██ We turn now to the contention that the Board relied on an improper presumption that the Local would enforce its bylaw illegally. The Local points out correctly that the Supreme Court has disapproved of presuming illegal enforcement to invalidate union rules. *See, e.g., Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 676, 81 S.Ct. 835, 840, 6 L.Ed.2d 11 (1961); *NLRB v. News Syndicate Co.*, 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29 (1961). Because the collective bargaining agreement was negotiated by the International with the National Elevator Association, whereas the bylaw is an unrelated provision in the Local's constitution, the two did not form part of a coordinated enforcement plan. Brief for Petitioner at 12. The Local contends that the only evidence of union plans for enforcement of the bylaw may be found in amendments to the Local's constitution specifying procedures for loss of good standing, Art. III, Sec. 5; J.A. 76–77, and authorizing liability for court costs in collection suits for unpaid fines, Art. XI, Sec. 3; J.A. 80. These amendments suggest that the union intended to enforce the bylaw by internal discipline only. Reply Brief of Petitioner at 4. Finally, the union contends that the savings clause in the collective bargaining agreement, stipulating that the union security clause is to be "effective to the extent permitted by applicable law," Standard Agreement, Art. III, ¶ 4; J.A. 8, appears to prohibit illicit coordination with the fines payable bylaw. Brief of Petitioner at 14. From the absence of evidence of actual coercive intent, the Local would have us conclude that the Board relied on the unjustifiable presumption that the union would act illegally as ground for invalidating the bylaw.

Had the Board found a violation of the Act in either the union security clause or the fines payable bylaw alone, it might have confused a presumption of illegality with a *per se* violation of the Act. The Board found, however, that the *conjunction* of the fines payable bylaw with the union security clause *was itself* sufficient coercion to violate the Act. The Board had no need to employ any presumption of illegal union activity in reaching this conclusion.

Cases relied on by the Local to argue against Board presumptions are thus distinguishable. In *International Brotherhood of Electrical Workers, Local 1547, AFL–CIO (Rogers Electric)*, 245 NLRB 716 (1979), for example, the Board sustained a union bylaw permitting the business manager to remove any member from a shop or job after concluding that removal was in the union's best interest. In rejecting the General Counsel's argument that the bylaw virtually licensed

union officials to pressure employment status illicitly, the Board refused to presume illegal use of the bylaw which might be used lawfully to protect effective union representation. *Id.* at 718. In *Rogers Electric,* however, the issue was stipulated to be only whether the bylaw itself violated Section 8(b)(1)(A), and not whether any steps to enforce it would do so. A similar distinction is to be found in the other line of cases relied on by the Local: Union requirements that internal remedies be exhausted before members resort to outside process have not been invalidated *per se,* but efforts to discipline union members for violating such requirements have been found to be unfair labor practices. *Compare Local 703, International Hod Carriers Building & Common Laborers' Union (Kuhne-Simmons Construction Co.),* 150 NLRB 1614 (1965) *with International Brotherhood of Teamsters (Red Ball Motor Freight),* 191 NLRB 479 (1971); *Operative Plasterers' & Cement Masons' International Assoc. (Arthur G. McKee),* 189 NLRB 553 (1971); and *Local 138, International Union of Operating Engineers (Charles S. Skura),* 148 NLRB 679 (1964).

If the Board did not presume illegal enforcement, the Local contends, it must have relied on the possibility that employees would misinterpret either the Local's constitution or the collective bargaining agreement in order to find the coercion necessary for a violation of the Act. To be oppressed by the conjunction of the two, an employee must assume that if he fails to pay his fines the Local will reject tender of dues, either by crediting dues payments against fines or rejecting payment altogether, and then seek his discharge under the union security clause. Brief for Petitioner at 14. The Local argues that both assumptions would be mistaken: the union security clause requires mere "tender" of dues and the savings clause prohibits its enforcement for any illegal purpose. Standard Agreement, Art. III, ¶¶ 2, 4; J.A. 83–84.

In support of its contention that the Board may not rely on the mistaken assumption of an employee, the Local quotes our decision in *Honolulu Star-Bulletin, Ltd. v. NLRB,* 274 F.2d 567, 570 (D.C.Cir.1959):

> From that premise the Board reasons that the contract is *per se* a closed shop contract. This conclusion is a complete *non sequitur.* An erroneous impression of plain terms does not change the meaning of the plain terms. Furthermore assumptions that employees will not understand a lawful contract cannot be a basis for holding the contract illegal.

*Honolulu Star-Bulletin,* however, involved far plainer contractual provisions than we face here. The *Honolulu Star-Bulletin* collective bargaining agreement stipulated that "employees" must be journeymen or apprentices but need not be union members, and that general laws of the union not in conflict with state or federal law governed collective bargaining relations not otherwise enumerated specifically. The union's general laws required a closed shop.[7] Because the closed shop was clearly illegal under federal law, this Court concluded that "there could hardly be any uncertainty respecting a closed-shop clause so far as this contract is concerned." *Id.* at 570.

The provisions to be interpreted in this case are more ambiguous. The Local's constitution does not state explicitly what actions will be taken to enforce the fines payable bylaw; members are left to speculate, for example, whether payments will be credited to dues first rather than to fines, or whether the Local will seek to enforce the fines payable bylaw by internal sanctions only. The Local concedes that its bylaw could have been "more artfully drawn," but argues that felicitous draftsmanship is a problem for the union and not for the Board. Reply Brief for Petitioner

---

7. The Board had found the combination a *per se* violation of the Act because potential employees might fear the union's rules would govern hiring decisions, made by a foreman who happened to be a union member. To misinterpret such a contract, an employee would need to assume the legality of the closed shop. He might also fear that the union would apply the contract illegally by hiring only union members. We have already disposed of the contention that the Board presumed such illegal union activity in the case at bar.

at 5. Impressions created by ambiguous union rules, however, may themselves coerce employees in violation of Section 8 of the Act. *Red Star Express Lines v. NLRB*, 196 F.2d 78 (2d Cir. 1952). Such is the coercion found by the Board here.

Nonetheless, the Local contends that we should overturn the Board's decision because the employee in this case did not in fact feel coerced to pay his fine. In finding the unfair labor practice here, the Board has adopted a *per se* rule against the combination of a fines payable bylaw with a union security clause.

The Local asserts that the Board's adoption of a *per se* approach departs abruptly from both prior disapproval of presumptions that unions will act illegally to enforce their rules and prior treatment of fines payable bylaws. We have already pointed out that the Board's decision need not have been based on a presumption of illegal union activity. It remains to consider whether the Board's decision was such a departure from prior treatment of fines payable bylaws as to be an abuse of discretion under the Act.

*National Lead Company, Titanium Division*, 106 NLRB 545 (1953) remains the leading Board treatment of a fines payable bylaw. In *National Lead*, the union enforced its rule making fines payable before dues by refusing to accept dues tendered by members delinquent in their fines. After two years, the union demanded payment of back dues and obtained the discharges of members who did not pay the dues. The Board found that this practice did not violate the Act, absent any attempt by the union to affect job status for nonpayment of the fines.

The Local contends that the instant case "is a significant extension of the Board's rules regarding threatened discharge for failure to pay fines." Brief for Petitioner at 21. While the Local is certainly correct

that under *National Lead* it would have been open to the Board not to find the combination of a union security clause and a fines payable bylaw *per se* unfair, *National Lead* is consistent with the Board's decision here. In *National Lead*, the letter demanding payment of back dues was explicit: "So that there may be no misunderstanding, this letter, and the contents thereof, refer only to your obligation to pay periodic dues ... and has no reference to fines or assessments." *Id.* at 546–47. *National Lead*, therefore, only approves the enforcement of dues obligations; it does not pass on a situation in which job security was threatened for unpaid fines.

The Board's treatment of the fines payable bylaw has been at most "evolutional". It does not involve the "erratic" shifts criticized previously by this Court and regarded as grounds for stricter standards of judicial review. *Local 777, Democratic Union Organizing Comm., Seafarers International Union of North America, AFL–CIO v. NLRB*, 603 F.2d 862, 893 (D.C.Cir.1979).[8] Matters such as the difficulty for the union of drafting a fines payable bylaw enforceable by internal sanctions only, or the relative likelihood that employees of varying sophistication will be threatened by the bylaw here, are for the expertise of the Board in interpreting the Act. Courts have considered it reasonable for the Board to assume that contractual agreements giving union officials generalized superseniority implicitly encourage union activity, even when officials do not take advantage of the available benefits.[9] We find it similarly reasonable for the Board to determine that a union security clause conjoined with a fines payable bylaw may induce unsophisticated employees to fear they will lose their jobs if they do not pay their fines.

We accordingly deny the petition for review and grant enforcement of the Board's order.

*It is so ordered.*

---

8. *Seafarers* involved three unexplained shifts by the Board within a few years. Even so, this Court's unwillingness to defer to the Board appears to have rested on its conclusion that the Board was mistaken as a matter of law. 603 F.2d at 894.

9. *See NLRB v. Milk Drivers & Dairy Employees, Local 338*, 531 F.2d 1162 (2d Cir. 1976).