# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 2, 2018　　　　　Decided May 8, 2018

No. 17-1058

LOCAL 58, INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS (IBEW), AFL-CIO,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

RYAN GREENE,
INTERVENOR

———

Consolidated with 17-1108

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Robert D. Fetter* argued the cause and filed the briefs for petitioner.

*Michael R. Hickson*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H.*

*Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

*Amanda K. Freeman* and *Glenn M. Taubman* were on the brief for intervenor Ryan Greene in support of the National Labor Relations Board. *Aaron B. Solem* entered an appearance.

Before: GARLAND, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Local 58, International Brotherhood of Electrical Workers (IBEW), AFL-CIO ("Local 58") petitions for review of an order of the National Labor Relations Board finding that its policy on resignation and revocation of dues-deduction authorization is an unlawful restriction on its members' statutory rights. Local 58 explains that it sought to provide "guidance to . . . members" in order to "protect [them] and the institution from fraud and forgery" in view of "numerous member-only benefits" — "as well as member-only democratic rights" — at stake. Pet'r's Br. 4. It now contends that the Board erred by failing to adhere to its long-recognized distinction between union policies that restrict or penalize a member's rights to resign or revoke, and those that impose procedural requirements or ministerial acts necessary to verify a member's resignation or revocation. For the following reasons, we conclude that the Board's determination that Local 58's policy unlawfully restricted its members' rights was reasonable, in part because the Board reaffirmed that all procedural requirements are not barred, and we deny the petition for review.

3

**I.**

Section 7 of the National Labor Relations Act ("NLRA") provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," and "also . . . the right to refrain from any or all of such activities." 29 U.S.C. § 157. Section 8, in turn, provides that it is "an unfair labor practice for a labor organization or its agents . . . to restrain or coerce . . . employees in the exercise of the rights guaranteed in [Section 7]." 29 U.S.C. § 158(b)(1)(A). With respect to membership dues, Section 302 of the Labor Management Relations Act ("LMRA"), which generally prohibits payments from an employer to a union, *see* 29 U.S.C. § 186(a), includes an exception permitting an employer to deduct union membership dues from employees' wages and remit those funds to the union "[p]rovided, [t]hat the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner," *id.* § 186(c)(4) (italics omitted). The Board has interpreted Section 7 of the NLRA to protect an employee's right to revoke any prior authorization for the deduction of union dues. *See Int'l Bhd. of Elec. Workers, Local No. 2088 (Lockheed Space Operations Co., Inc.)*, 302 NLRB 322, 327 (1991).

Local 58 operates a Union Hall in Detroit, Michigan. It represents approximately 4,000 electricians in the construction industry across southeastern Michigan who work under multi-employer agreements and are designated by the IBEW constitution as "A" members. Local 58 also represents several hundred employees in manufacturing, maintenance, and

government who work under agreements with individual employers and are designated under the IBEW constitution as "BA" members. "A" members pay a higher dues rate and are entitled to more benefits than "BA" members, including a dues-funded pension and death benefit.

On October 1, 2014, Local 58's business manager and financial secretary, Michael Richard, instituted a "Policy Regarding Procedure for Opting Out of Membership Rights, Benefits, and Obligations." The policy imposed new requirements that a union member wishing to resign membership or opt out of dues deduction must appear in person at Local 58's Union Hall with a picture identification and a written request indicating the member's intent. The policy further stated that any member who "feels that appearing in person at the Union Hall of IBEW Local 58 poses an undue hardship may make other arrangements that verify the identification of the member by contacting the Union Hall." Local 58 posted the policy at its Union Hall and distributed it to its stewards, staff, and elected officers.

On April 6, 2015, Ryan Greene, a member of Local 58, filed an unfair labor practice charge based on the new policy. Upon investigation, the Board's General Counsel issued a complaint alleging that Local 58 violated Section 8(b)(1)(A) of the NLRA by maintaining a policy that restrains union members' rights to resign their union membership and to revoke their dues-deduction authorizations. At an evidentiary hearing, Richard testified that he instituted the policy to verify the authenticity of resignations and revocations of dues deductions authorizations because of concern that a fraudulent resignation or revocation could interrupt an employee's union membership and thereby deprive the employee of pension or death benefits without the employee being aware of this result. Hg. Tr. 38 (July 30, 2015). When he was working in the field

as an electrician, Richard explained, he had called a Local in Indianapolis to remove himself from their "book," and thus from consideration for the next available job, and was informed he must appear in person and show identification to protect against another individual fraudulently clearing his name off the books to settle a grudge or for the benefit of someone else below him on the book. *Id.* at 35-36. In his testimony, Richard emphasized that any break in union membership could deprive an employee of pension or death benefits, and that he, Richard, did not want to be in the position of explaining to a family member seeking death benefits that a deceased member's resignation had never been verified. *Id.* at 38.

An administrative law judge ("ALJ") concluded Local 58's policy did not violate the NLRA because it did not restrict members' rights to resign or revoke dues-deductions authorizations. Upon exceptions by the General Counsel and Greene, the Board concluded, with one Member dissenting, that Local 58 had violated the NLRA as alleged. The Board issued a cease and desist order that also directed Local 58 to rescind the policy and post a remedial notice. Local 58 petitions for review.

**II.**

Local 58 challenges the Board's decision as erroneously disregarding the long-established distinction between union policies that restrict members' statutory rights and those that impose procedural or ministerial requirements to validate resignation, which are not categorically impermissible and whose burden on members' rights the Board will balance against the union's reason for adopting the policy. Local 58 points to Board precedent striking down union rules that temporally restrict resignation to a 30-day notice period or prohibit resignation during a strike, *Bricklayers Local 17 (Cal.*

*Tile Co.)*, 271 NLRB 1571, 1571 (1984), *Machinists Local 1414 (Neufeld Porsche-Audi, Inc.)*, 270 NLRB 1330, 1334 (1984), while ruling permissible a union rule that set administrative or ministerial requirements, such as requiring a writing stating the members' intent to be sent to a designated union officer, *UAW, Local 148 (Douglas Aircraft Co.)*, 296 NLRB 970, 971 (1989); *Telephone Traffic Union Local 212 (New York Telephone Co.)*, 278 NLRB 998, 998 n.1 (1986). Based on these precedents, Local 58 maintains that the Board's conclusion that its policy, on its face, impermissibly restricts resignation ignores both the actual text of the policy as well as decades of labor law distinguishing between union rules that circumscribe a member's right to resign at a particular time or punish a member for resigning and policies that provide for a procedure necessary to ensure the authenticity of a resignation.

The Board possesses "special competence in the field of labor relations" and is charged with "the primary responsibility for applying the general provisions of the [NLRA] to the complexities of industrial life." *Pattern Makers' League of N. Am. v. NLRB*, 473 U.S. 95, 100, 114 (1985) (internal quotations and citations omitted). Its interpretation of the NLRA is entitled to "substantial deference" and must be upheld if reasonable, even if a reviewing court "might prefer another view of the statute." *Id.* (internal quotations and citations omitted); *accord Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979). This court will therefore "abide [by the Board's] interpretation . . . if it is reasonable and consistent with controlling precedent." *Brockton Hosp. v. NLRB*, 294 F.3d 100, 103 (D.C. Cir. 2002) (citing *Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000)). Indeed, the court recognizes that the tendency of a particular union rule to restrain or coerce employees is a matter "for the expertise of the Board." *Intern. Union of Elevator Constructors Local Union No. 8 v. NLRB*, 665 F.2d 376, 382 (D.C. Cir. 1981).

In *Scofield v. NLRB*, 394 U.S. 423, 429 (1969), the Supreme Court interpreted the NLRA to distinguish between lawful and unlawful union rules, holding union rules that "invade[] or frustrate[] an overriding policy of the labor laws" are impermissible without regard to the union interest prompting their promulgation. Section 8 of the NLRA only "leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." *Id.* at 430. The Board, in turn, has concluded that "restrictions on resignations impair the fundamental policies found in the express language and consistent interpretation of Section 7." *Neufeld Porsche-Audi*, 270 NLRB at 1333. The Board thus reasonably interprets the NLRA to prohibit categorically union policies that "delay or otherwise impede" a member's right to resign or revoke. *Id.*; *see Pattern Makers' League*, 473 U.S. at 104-05.

The Board concluded Local 58's policy was, on its face, an impermissible restriction on members' Section 7 rights to resign. The policy requires members, regardless of where they live or work, to visit the Union Hall in person. Together, the Board found, "the combined 'in person' and 'picture identification' requirements" were tantamount to a restriction on resignation inasmuch as the policy would "burden" members who live or work some distance from the Union Hall, "surely cost[ing] them time and money." Dec. at 3. The in-person requirement would also be burdensome for "resigning members who wished to avoid a face-to-face encounter with a union representative," and, in the Board's view, "the prospect of such face-to-face encounters could present a particularly significant impediment for members who wish to resign during a strike or lockout." *Id.* Requiring members to present photo

identification erects another hurdle for any member who lacks such identification and must acquire it, if the member can. *Id.* The Board distinguished *Auto Workers Local 148 (McDonnell-Douglas)*, 296 NLRB 970, 971 (1989), where it found permissible union rules requiring a member wishing to resign to put his resignation in writing and send it to a designated union officer, Dec. at 3 & n. 11, on the ground that Local 58's "policy . . . demands far more of union members than our decisions permit" because it places a "significant burden" on union members, *id.* The Board observed that there was no evidence Local 58 itself had experienced the type of fraud that prompted Richard to issue the policy.

Further, the Board concluded that the undue hardship alternative in the 2014 policy was insufficient to render the policy permissible because it was unacceptably ambiguous. The text "create[d] uncertainty about whether unfettered access to resignation will be granted *at all* if a member is unable to negotiate other arrangements . . . to the satisfaction of [Local 58]." Dec. at 3 (italics in original). It was also "silent about what such 'other arrangements' might be or how [Local 58] will exercise its apparent discretion to determine whether the arrangements are sufficient." *Id.* The Board has forewarned that "[i]mpressions created by ambiguous union rules . . . may themselves coerce employees in violation of Section 8 of the [NLRA]." *Intern. Union of Elevator Constructors, Local Union No. 8*, 665 F.2d at 382 (citation omitted). Although the dissenting Member interpreted Local 58's policy to allow its members to determine what constitutes a hardship and what other arrangements might be sufficient, *see* Dis. Op. at 7, the Board persuasively responded that "[a]t a minimum, the policy — as a rule adopted by and imposed on members — can reasonably be interpreted to give ultimate authority to [Local 58]." Dec. at 3 n.10.

Still, Local 58 objects to the Board's evaluation of its policy because, in addition to the fraud concerns identified at the hearing, the Board failed to give appropriate weight to the difficult practical position it faced. As Local 58's counsel indicated, requiring a writing to verify resignation or revocation may not suffice. For instance, the author of such a writing could fraudulently assume another member's identity and resign in his name. A member might notice that union dues had ceased being deducted from his or her paycheck and re-join the union, but that member may not be aware of the impact that even a short break in membership would have on his or her pension, preventing collection of any benefit. *See* Oral Arg. 8:24. Similar fraudulent resignations could be used to alter the voting pool ahead of an election. *See* Oral Arg. 9:08.

Implicit in Local 58's position is that the Board was required to weigh its interests before determining whether its policy was an invalid restriction on members' Section 7 rights. The Board never reached the question of whether limiting Local 58 to requiring a writing to verify resignation or revocation would be insufficient to vindicate Local 58's concerns. Nor was it required to do so upon concluding that the policy was facially invalid. Where the Board reasonably construed its precedents in concluding Local 58's policy restricted members' rights to resign, it was not required under *Scofield* to weigh Local 58's interest. *See Scofield*, 394 U.S. at 429-30. The court has no occasion to decide whether, had there been evidence proffered of "instances of fraud" among Local 58's members, the Board could reasonably have invoked *Scofield*'s "impairment" standard without balancing a union's interest as shown by an evidentiary record. Here, the Board concluded simply that, on the record before it, requiring physical presence with photo identification was unduly burdensome.

In concluding the Board's decision that Local 58's policy was facially invalid was reasonable, the court rests in part on the Board's reaffirmation of its precedent that not every procedural requirement will unlawfully burden members' Section 7 rights. Dec. at 3. Contrary to the statements in Local 58's brief, Pet'r's Br. 5, 31-32, the Board expressly preserved a union's ability to impose ministerial requirements on the resignation process. "Certainly, a union member who wishes to resign can be required to take minimal affirmative steps to effectively communicate his intention to the union, such as putting the resignation in writing and sending it to a designated union officer." Dec. at 3 & n.11 (citing *McDonnell-Douglas*, 296 NLRB at 971). The Board has not foreclosed Local 58 from requiring other means of verifying identification to vindicate its antifraud interests. Nor did the Board foreclose Local 58 from promulgating a substantially similar policy that included a description of acceptable alternative arrangements in the event of undue hardship. Technology may provide alternatives even as may more prosaic means; here, for example, Local 58 was able to verify Ryan Greene's resignation by telephone without requiring his physical presence at the Union Hall.

For reasons discussed, the Board reasonably concluded that Local 58's policy impermissibly restricts members' rights to revoke their dues-deduction authorizations. The Board relied on *Newport News Shipbuilding and Dry Dock Co.*, 253 NLRB 721, 731-32 (1980), *enf'd sub nom. Peninsula Shipbuilders' Ass'n v. NLRB*, 663 F.2d 488 (4th Cir. 1981). There, the Board had concluded that "a requirement that employees appear in person at a union hall in order to revoke checkoff would impose, inherently, an unconscionable impediment to the free choice conferred by [LMRA] Section 302(c)(4)." *Id.* Here, the Board concluded that, "[a]s explained," the undue hardship provision in Local 58's policy

"is insufficient to mitigate the burden imposed by the policy." Dec. at 4. Again, the Board did not foreclose the possibility that Local 58 could identify acceptable alternatives in the event of undue hardship. The court, therefore, has no need to reach the Board's conclusion that the policy represents a unilateral modification by the union of the dues-deduction agreements without individual employees' consent.

Accordingly, we deny the petition for review and grant the Board's cross-application for enforcement of its Order.