## SCOFIELD ET AL. *v.* NATIONAL LABOR RELATIONS BOARD ET AL.

No. 273.   Argued January 14, 1969.—Decided April 1, 1969.

*James Urdan* argued the cause and filed a brief for petitioners.

*Norton J. Come* argued the cause for respondent National Labor Relations Board. With him on the brief were *Solicitor General Griswold, Arnold Ordman,* and *Dominick L. Manoli. John Silard* argued the cause for respondent International Union, United Automobile Workers. With him on the brief were *Joseph L. Rauh, Jr.,* and *Stephen I. Schlossberg.*

*Walter S. Davis* filed a brief for the Wisconsin Manufacturers Assn. et al. as *amici curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

Half the production employees of the Wisconsin Motor Corporation are paid on a piecework or incentive basis. They and the other employees are represented by respondent union, which has had contractual relations with the company since 1937.[1] In 1938 the union initiated a ceiling on the production for which its members would accept immediate piecework pay. This was done at first by gentlemen's agreement among the members, but since 1944 by union rule enforceable by fines and expulsion. As the rule functions now, members may produce as much as they like each day, but may only draw pay up to the ceiling rate. The additional production is "banked" by the company; that is, wages due for it are retained by the company and paid out to the employee for days on which the production ceiling has not been

---

[1] There is a union security clause in the current contract, giving each employee, after a 30-day waiting period, the option of becoming and remaining a member in good standing of the union, or of declining membership but paying the union a "service fee."

reached because of machine breakdown or for some other reason. If the member demands to be paid in full each pay period over the ceiling rate the company will comply, but the union assesses a fine of $1 for each violation, and in cases of repeated violation may fine the member up to $100 for "conduct unbecoming a union member." Failure to pay the fine may lead to expulsion. As the trial examiner found, the company's complaint is not and cannot be that "the employee, for the pay he receives, has not given the requisite *quid pro quo* in production." 145 N. L. R. B. 1097, 1120. Rather, the question is the extent to which the group will forgo for pay the rest periods it has bargained for, and the discipline which the union may invoke to achieve unity toward this end which, the trial examiner found, was "manifestly a matter affecting the interest of the group and in which its collective bargaining strength hinges upon the cooperation of its individual components." *Ibid.*

The collective bargaining contract between employer and union defines a "machine rate" of hourly pay guaranteed to the employees. The piecework rate, as defined by the contract, is set at such a level that "the average competent operator working at a reasonable pace [as determined by a time study] shall earn not less than the machine rate of his assigned task." [2] Allowances are made in the time study for setting up machinery, cleaning tools, fatigue, and personal needs. By ignoring these allowances or by speed and efficiency it is possible for an industrious employee to produce faster than the machine rate. If he does so, he is entitled to additional pay. Union members, however, are subject to the banking procedures imposed by the union rule.

---

[2] There is also a "day rate," lower than the machine rate, which applies to periods in which the incentive worker has not been producing, or has produced scrap, through no fault of the company's. That rate is of no concern here.

The margin between the "machine" rate set by the contract and the ceiling rate set by the union was 10¢ per hour in 1944. As a result of collective bargaining between company and union over both the machine and ceiling rates, the margin has been increased to between 45¢ and 50¢, depending on the skill level of the job. The company has regularly urged the union to abandon the ceiling and has never agreed to refuse employees immediate pay for work done over the ceiling. However, the parties have bargained over the ceiling rate and the company has extracted from the union promises to increase the ceiling rate. The company opens its work records to the union to permit it to check compliance with the ceiling; pays union stewards for time spent in this checking activity as legitimate union business; and banks money for union members complying with the rule. The ceiling rate is also used in computing piece rate increases and in settling grievances.

This case arose in 1961 when a random card check by the union showed that petitioners, among other union members, had exceeded the ceiling. The union membership imposed fines of $50 to $100, and a year's suspension from the union. Petitioners refused to pay the fines, and the union brought suit in state court to collect the fines as a matter of local contract law.[3] Petitioners then initiated charges before the National Labor Relations Board, arguing that union enforcement of its rule through the collection of fines was an unfair labor practice. Petitioners asserted that their right to refrain

---

[3] Unless the rule or its enforcement impinges on some policy of the federal labor law, the regulation of the relationship between union and employee is a contractual matter governed by local law. As the trial examiner put it in this case, the Board "never intended . . . to suggest that the disciplinary action[s] in enforcement of [union] rules . . . were affirmatively protected under the Act, as opposed to merely being not violations thereof." It is thus a "federally unentered enclave" open to state law. 145 N. L. R. B., at 1133.

from "concerted activities," National Labor Relations Act, § 7, 49 Stat. 452, as amended, 29 U. S. C. § 157, was impaired by the union's effort to "restrain or coerce" them, in violation of NLRA, § 8 (b)(1)(A). The trial examiner, after extensive findings, concluded that there was no violation of the Act, and his findings and recommendations were adopted by the Board, 145 N. L. R. B. 1097 (1964), whose order was enforced by the Court of Appeals for the Seventh Circuit, 393 F. 2d 49 (1968). We affirm.

I.

We are met at the outset with the contention that the petition for certiorari was untimely filed. In civil suits certiorari must be applied for "within ninety days after the entry of [the] judgment or decree" of which review is sought. 28 U. S. C. § 2101 (c). In this case an opinion of March 5, 1968, concluded that "upon presentation, an appropriate decree will be entered." A decree was in fact entered on April 16, 1968. The petition for certiorari was docketed here on July 6, 1968, within 90 days of the decree but not of the opinion.

In our view, the petition for certiorari was timely filed. Petitioners here received a copy of the March 5 opinion, but were given no notice of any entry of judgment on that date, as would be required by Rule 36 of the new Federal Rules of Appellate Procedure, effective July 1, 1968. Since no notice was given and it could not have been clear to petitioners whether there was a March 5 judgment or not we hold, without abandoning the standard that a "judgment for our purposes is final when the issues are adjudged" and settled with finality, *Market Street R. Co.* v. *Railroad Commission*, 324 U. S. 548, 551–552 (1945); *FTC* v. *Minneapolis-Honeywell Regulator Co.*, 344 U. S. 206, 212 (1952), that in this case the relevant date is that of the entry of the decree. Cf. *Rubber Co.* v. *Goodyear*, 6 Wall. 153, 156 (1868).

## II.

Section 8 (b)(1) makes it an unfair labor practice to "restrain or coerce (A) employees in the exercise of the rights guaranteed in [§ 7]: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein . . . ."

Based on the legislative history of the section, including its proviso, the Court in *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 195 (1967), distinguished between internal and external enforcement of union rules and held that "Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." A union rule, duly adopted and not the arbitrary fiat of a union officer, forbidding the crossing of a picket line during a strike was therefore enforceable against voluntary union members by expulsion or a reasonable fine. The Court thus essentially accepted the position of the National Labor Relations Board dating from *Minneapolis Star & Tribune Co.,* 109 N. L. R. B. 727 (1954) where the Board also distinguished internal from external enforcement [4] in holding that a union could fine a member for his failure to take part in picketing during a strike but that the same rule could not be enforced by causing the employer to exclude him from the work force or by affecting his seniority without triggering violations of §§ 8 (b)(1), 8 (b)(2), 8 (a)(1), 8 (a)(2), and 8 (a)(3). These sec-

---

[4] The Board has long held that § 8 (b)(1)(A)'s legislative history requires a narrow construction which nevertheless proscribes unacceptable methods of union coercion, such as physical violence to induce employees to join the union or to join in a strike. *In re Maritime Union,* 78 N. L. R. B. 971, enforced, 175 F. 2d 686 (C. A. 2d Cir. 1949).

tions form a web, of which § 8 (b)(1)(A) is only a strand, preventing the union from inducing the employer to use the emoluments of the job to enforce the union's rules.[5]

This interpretation of § 8 (b)(1), as the Court explained in *Allis-Chalmers,* 388 U. S., at 193–195, was reinforced by the Landrum-Griffin Act of 1959 which, although it dealt with the internal affairs of unions, including the procedures for imposing fines or expulsion, did not purport to overturn or modify the Board's interpretation of § 8 (b)(1).[6] And it was this interpretation which the Board followed in *Allis-Chalmers* and in the case now before us.

Although the Board's construction of the section emphasizes the sanction imposed, rather than the rule itself, and does not involve the Board in judging the fairness or wisdom of particular union rules, it has become clear that if the rule invades or frustrates an overriding policy of the labor laws the rule may not be enforced, even by fine or expulsion, without violating § 8 (b)(1). In both

---

[5] The Court has held that the "policy of the Act is to insulate employees' jobs from their organizational rights." *Radio Officers' Union* v. *National Labor Relations Board,* 347 U. S. 17, 40 (1954). As an employee, he may be a "good, bad, or indifferent" member so long as he meets the financial obligations of the union security contract. Thus the Board has found an unfair labor practice by union and employer where an employee was discharged for violation of a union rule limiting production. *Printz Leather Co.,* 94 N. L. R. B. 1312 (1951). But as a union member, so long as he chooses to remain one, he is subject to union discipline.

[6] As part of the bill of rights of union members, the Landrum-Griffin Act guaranteed freedom of speech and assembly *"Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." Pub. L. 86–257, Tit. I, § 101 (a)(2), 73 Stat. 522, 29 U. S. C. § 411 (a)(2).

*Skura* [7] and *Marine Workers*,[8] the Board was concerned with union rules requiring a member to exhaust union remedies before filing an unfair labor practice charge with the Board. That rule, in the Board's view, frustrated the enforcement scheme established by the statute and the union would commit an unfair labor practice by fining or expelling members who violated the rule.

The *Marine Workers* case came here [9] and the result reached by the Board was sustained, the Court agreeing that the rule in question was contrary to the plain policy of the Act to keep employees completely free from coercion against making complaints to the Board. Frustrating this policy was beyond the legitimate interest of the labor organization, at least where the member's complaint concerned conduct of the employer as well as the union.

Under this dual approach, § 8 (b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule. This view of the statute must be applied here.

### III.

In the case at hand, there is no showing in the record that the fines were unreasonable or the mere fiat of a union leader, or that the membership of petitioners in the union was involuntary. Moreover, the enforcement of the rule was not carried out through means unacceptable in themselves, such as violence or employer discrimi-

---

[7] *Local 138, International Union of Operating Engineers*, 148 N. L. R. B. 679 (1964).

[8] *Industrial Union of Marine & Shipbuilding Workers of America*, 159 N. L. R. B. 1065 (1966).

[9] *National Labor Relations Board* v. *Industrial Union of Marine & Shipbuilding Workers*, 391 U. S. 418 (1968).

nation. It was enforced solely through the internal technique of union fines, collected by threat of expulsion or judicial action. The inquiry must therefore focus on the legitimacy of the union interest vindicated by the rule and the extent to which any policy of the Act may be violated by the union-imposed production ceiling.

As both the trial examiner and the Court of Appeals noted, union opposition to unlimited piecework pay systems is historic. Union apprehension, not without foundation, is that such systems will drive up employee productivity and in turn create pressures to lower the piecework rate so that at the new, higher level of output employees are earning little more than they did before. The fear is that the competitive pressure generated will endanger workers' health, foment jealousies, and reduce the work force. In addition, the findings of the trial examiner were that the ceiling served as a yardstick for the settlement of job allowance grievances, that it has played an important role in negotiating the minimum hourly rate and that it is the standard for "factoring" the hourly rate raises into the piecework rate. The view of the trial examiner was that "in terms of a union's traditional function of trying to serve the economic interests of the group as a whole, the Union has a very real, immediate, and direct interest in it." 145 N. L. R. B., at 1135.

It is doubtless true that the union rule in question here affects the interests of all three participants in the labor-management relation: employer, employee, and union.[10]

---

[10] The company prefers to employ the minimum number of the most energetic men available; a piecework pay scheme without a ceiling could help it obtain its objective of winnowing the men and reducing their piecework rate. Each employee, as well, has an interest in the ceiling. A slow worker would prefer a low ceiling to protect himself against invidious comparison with faster workers and a possible reduction of the work force beginning with him. A fast worker may prefer to earn as much as possible in a day and so

Although the enforcement of the rule is handled as an internal union matter, the rule has and was intended to have an impact beyond the confines of the union organization. But as *Allis-Chalmers* and *Marine Workers* made clear, it does not follow from this that the enforcement of the rule violates § 8 (b)(1)(A), unless some impairment of a statutory labor policy can be shown.

The principal contention of the petitioners is that the rule impedes collective bargaining, a process nurtured in many ways by the Act. But surely this is not the case here. The union has never denied that the ceiling is a bargainable issue. It has never refused to bargain about it as far as this record shows. Indeed, the union has at various times agreed to raise its ceiling in return for an increase in the piece rate, and the ceiling has been regularly used to compute the new piece rate. In light of this bargaining history it can hardly be said that the union rule has removed this issue from the bargaining table. The company has repeatedly sought an agreement eliminating the piecework ceiling, an agreement which, had it been obtained, unquestionably would have been violated by the union rule. But the company could not attain this. Although, like the union, it could have pressed the point to impasse, *Fibreboard Paper Products Corp.* v. *National Labor Relations Board,* 379 U. S. 203, 209–215 (1964), followed by strike or lockout, it has never done so. Instead, it has signed contracts recognizing the

---

desire a high ceiling or none at all. But all workers have an interest in maintaining a ceiling to the extent that it is necessary to prevent reductions in the piecework rate. The employer and the union (representing the group) may seek to vindicate their interests in bargaining. The individual member may express his interest within the union councils in determining what the group position shall be— and here the trial examiner found that the employees overwhelmingly approved of the ceiling—or through exercising the option of withdrawing from the union.

ceiling, has tolerated it, and has cooperated in its administration by honoring requests by employees to bank their pay for over-ceiling work. We discern no basis in the statutory policy encouraging collective bargaining for giving the employer a better bargain than he has been able to strike at the bargaining table.[11]

Nor does the union ceiling itself or compliance with it by union members violate the collective contract. The company and the union have agreed to an incentive pay scale, but they have also established a guaranteed minimum or machine rate considerably below the union ceiling and defined in the contract as the rate of production of an average, efficient worker. The contract therefore leaves in the hands of the employee the option of taking full advantage of his allowances, performing only as an average employee and not reaching even the ceiling rate. At least there is nothing before us to indicate that the company disciplines individuals who work at only the machine rate or individuals who produce more but who choose not to exceed the union ceiling. The same decision can be made collectively by the union. Although it has agreed in the contract to a pay scale for production in excess of ceiling, that fact in the context of this case does not support an inference that the union has agreed not to impose the ceiling or that its action in announcing one is somehow contrary to the contract. And if neither union nor member is in breach of contract for establishing and adhering to the ceiling, it is equally clear that the rule neither causes nor invites a contract violation by the employer who stands ready to pay an employee for his over-ceiling production or to bank it at his request.

---

[11] The trial examiner suggests that if the ceilings did not exist, the management might well invent them to serve its own purposes: maintaining careful work standards and a low scrap rate, and permitting the prediction of production output. 145 N. L. R. B., at 1119–1120.

Petitioners purport to characterize the union rule as featherbedding, but it is hard to square this with the collective agreement that an average, efficient employee produces at a "machine" rate substantially below the ceiling. Beyond that, however, Congress has addressed itself specifically to the problem of featherbedding in § 8 (b)(6), making it an unfair labor practice "to cause or attempt to cause an employer to pay or deliver or agree to pay or deliver any money or other thing of value, in the nature of an exaction, for services which are not performed or not to be performed . . . ." 61 Stat. 142, 29 U. S. C. § 158 (b)(6). This narrow prohibition was enacted partly because the Congress found it difficult to define with more particularity just where the area between shiftlessness and overwork should lie.[12] Since Congress has addressed itself to the problem specifically and left a broad area for private negotiation, there is no present occasion for the courts to interfere with private decision. Indeed, there is no claim before us that the rule violates § 8 (b)(6). If the company wants to require more work of its employees, let it strike a better bargain. The labor laws as presently drawn will not do so for it.

This leaves the possible argument that because the union has not successfully bargained for a contractual ceiling, it may not impose one on its own members, for doing so will discriminate between members and those

---

[12] Senator Taft, cosponsor of the bill and Chairman of the Senate Committee on Labor and Public Welfare, stated on the floor of the Senate that to do more "would require a practical application of the law by the courts in hundreds of different industries, and a determination of facts which it seemed to me would be almost impossible." By contrast, he said, "we did accept one provision" which "seemed to be a fairly clear case, easy to determine" and narrow. 93 Cong. Rec. 6441.

others who are free to earn as much as the contract permits. All members of the bargaining unit, however, have the same contractual rights. In dealing with the employer as bargaining agent, the union has accorded all employees uniform treatment. If members are prevented from taking advantage of their contractual rights bargained for all employees it is because they have chosen to become and remain union members. In *Allis-Chalmers,* the union members were subject to the discipline of an internal rule which strengthened the union's hand in bargaining and in this respect benefited both the members who obeyed the rule and the nonmembers who did not. The same is true here, and the price of obeying the rule is not as high as in *Allis-Chalmers.* There the member could be replaced for his refusal to report to work during a strike; here he need simply limit his production and suffer whatever consequences that conduct may entail. If a member chooses not to engage in this concerted activity and is unable to prevail on the other members to change the rule, then he may leave the union and obtain whatever benefits in job advancement and extra pay may result from extra work, at the same time enjoying the protection from competition, the high piece rate, and the job security which compliance with the union rule by union members tends to promote.

That the choice to remain a member results in differences between union members and other employees raises no serious issue under § 8 (b)(2) and § 8 (a)(3) of the Act, because the union has not induced the employer to discriminate against the member but has merely forbidden the member to take advantage of benefits which the employer stands willing to confer. Those sections are not aimed at completely internal union discipline of union members, even though the discipline

may result in the member's refusal to accept work offered by the employer. *Allis-Chalmers* makes this quite clear.

The union rule here left the collective bargaining process unimpaired, breached no collective contract, required no pay for unperformed services, induced no discrimination by the employer against any class of employees, and represents no dereliction by the union of its duty of fair representation. In light of this, and the acceptable manner in which the rule was enforced, vindicating a legitimate union interest, it is impossible to say that it contravened any policy of the Act.

We affirm, holding that the union rule is valid and that its enforcement by reasonable fines does not constitute the restraint or coercion proscribed by § 8 (b)(1)(A).

*Affirmed.*

Mr. Justice Marshall took no part in the consideration or decision of this case.

Mr. Justice Black, dissenting.

Because the union members collected from their employer extra pay for piecework production in excess of that agreed upon by the union and the company, the union has tried the members, fined them, and suspended them from the union for one year. Section 8 (b)(1) of the National Labor Relations Act makes it an unfair labor practice for a union to "restrain or coerce" employees in the exercise of their right under § 7 to refrain from any or all concerted activities. In this case the National Labor Relations Board held that the union did not commit an unfair labor practice in coercing employees through fines and suspensions into refusing to engage in this concerted activity. I dissent from affirming this order of the Board for the reasons set out at length in my dissenting opinion in *NLRB* v. *Allis-Chalmers Mfg. Co.*, 388 U. S. 175, 199 (1967).