725 F.2d 1212
 115 L.R.R.M. (BNA) 2972, 100 Lab.Cas. P 10,805
 MACHINISTS LOCAL 1327, INTERNATIONAL ASSOCIATION OF
MACHINISTS AND AEROSPACE WORKERS, AFL-CIO,
DISTRICT LODGE 115, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Viola Lapinski, Hilda Hall, and Polmyra Gomes, Intervenors.
DISTRICT LODGE 160, INTERNATIONAL ASSOCIATION OF MACHINISTS
AND AEROSPACE WORKERS, AFL-CIO, and Affiliated
Local Lodge 1028, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Robert C. Ferguson, Intervenor.
 Nos. 82-7580, 82-7701, 83-7052 and 83-7089.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 8, 1983.
Decided Feb. 14, 1984.
 
 Laurence Gold, Washington, D.C., for petitioner.
 Barbara Atkin, NLRB, Washington, D.C., for respondent.
 On Petitions for Review and Cross-Applications for Enforcement of an Order of the National Labor Relations Board.
 Before TUTTLE* and MERRILL, Senior Circuit Judges, and PREGERSON, Circuit Judge.
 PREGERSON, Circuit Judge:
 
 
 1
 The question presented is whether a labor organization reasonably restricts the right to resign union membership when it imposes a fine under its constitution on a member who quits the union during a strike to resume working for the struck employer.[1] Because the restriction at issue comports with both national labor policy and the test set out in Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), we refuse to enforce the order of the National Labor Relations Board.
 
 BACKGROUND
 
 2
 This case comes before us a second time. The parties do not dispute the facts, which we first outlined in NLRB v. Machinists Local 1327 (Machinists I), 608 F.2d 1219 (9th Cir.1979). The facts show that shortly before calling an economic strike against the employer, the union reminded all members about the following rule in the union's constitution:
 
 
 3
 Improper Conduct of a Member: ... Accepting employment in any capacity in an establishment where a strike or lockout exists as recognized under this Constitution, without permission. Resignation shall not relieve a member of his obligation to refrain from accepting employment at the establishment for the duration of the strike or lockout within 14 days preceding its commencement ....
 
 
 4
 Eight months after the strike began, three of the intervenor employees, Viola Lapinski, Hilda Hall, and Polmyra Gomes, submitted their resignations to the union, crossed the picket line, and returned to work. Later, the union imposed court-collectible fines on each employee for violating the rule. The employees responded by complaining that the union had violated National Labor Relations Act (NLRA) Sec. 8(b)(1)(A), 29 U.S.C. Sec. 158(b)(1)(A) (1976),[2] and the Board issued a complaint. In a case tried on stipulated facts, the Board construed the provision as merely prohibiting certain post-resignation conduct, not as restricting the union member's right to resign. 231 N.L.R.B. 719, 720-21 (1977).
 
 
 5
 Considering that decision on the first appeal, we criticized the Board's construction of the provision as "hypertechnical." Machinists I, 608 F.2d at 1222. We concluded that the rule "defines or limits the circumstances under which a member may resign, and is a restriction on a member's right to resign," and asked the Board on remand to determine whether such a restriction was valid. Id.
 
 
 6
 On remand, a plurality of the Board decided that it should balance two competing interests: the employee's right to refrain from collective activity under NLRA Sec. 7, 29 U.S.C. Sec. 157 (1976), and the legitimate interest of a union in representing every employee in its bargaining unit. 263 N.L.R.B. 984, 985 (1982) (Fanning & Zimmerman, Members). After performing this operation, the plurality held that a union rule limiting a member's right to resign only to non-strike periods "constitutes an unreasonable restriction" on the right to resign. Id. at 986. The plurality went on to articulate a new rule permitting a union to prohibit a resignation "for a period not to exceed thirty days after the tender of such a resignation." Id. at 987.
 
 
 7
 But the two Board members who concurred in the result thought that any restriction on the employee's right to resign from the union is an unfair labor practice. Id. at 987-88 (Van de Water, Chairman & Hunter, Member, concurring). They filed a lengthy opinion disagreeing with the plurality's 30-day rule and virtually all of its reasoning.
 
 
 8
 A fifth Board member dissented altogether. He would have held that the rule was a reasonable restriction on the right to resign. Id. at 993 (Jenkins, Member, dissenting).
 
 
 9
 The union now petitions for review and the Board cross-applies for enforcement of its order.
 
 STANDARD OF REVIEW
 
 10
 Ordinarily, we give "considerable deference" to the Board's expertise in construing and applying the labor laws. Bureau of Alcohol, Tobacco & Firearms v. FLRA, --- U.S. ----, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983); see NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1149-50, 10 L.Ed.2d 308 (1963); NLRB v. United Association of Journeymen & Apprentices of the Plumbing & Pipefitting Industries, 704 F.2d 1164, 1166 (9th Cir.1983).
 
 
 11
 But " 'the deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress.' " Bureau of Alcohol, Tobacco & Firearms v. FLRA, 104 S.Ct. at 444 (quoting American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965)).
 
 
 12
 Therefore, although we should uphold the Board's reasonable and defensible constructions of the NLRA, we must not " 'rubber-stamp ... administrative decisions that [we] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying [the] statute.' " Bureau of Alcohol, Tobacco & Firearms v. FLRA, 104 S.Ct. at 444 (quoting NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)); see Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 166, 92 S.Ct. 383, 390-91, 30 L.Ed.2d 341 (1971).
 
 
 13
 For the reasons that follow, we believe that the Board's holding, including its 30-day rule,[3] frustrates federal labor policy in important respects.
 
 ANALYSIS
 
 14
 A. National Labor Policy and Union Discipline
 
 
 15
 Our national labor policy is built on the premise that employees can bargain most effectively for improvements in wages, hours, and working conditions by pooling their economic strength and acting through freely chosen labor organizations. NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 180, 87 S.Ct. 2001, 2006-07, 18 L.Ed.2d 1123 (1967).
 
 
 16
 Congress embraced this policy when it passed the Wagner Act in 1935 because the history of the labor movement demonstrated that employees who acted collectively were far more successful in improving their lot than those who faced employers individually. See A. Cox, D. Bok & R. Gorman, Cases and Materials on Labor Law 15-17 (8th ed. 1977). But to ensure that a union could not abuse its position as an exclusive bargaining representative, Congress also enacted the Taft-Hartley Act of 1947 and the Landrum-Griffith Act of 1959. These laws made unfair labor practices out of union conduct coercing employees in the exercise of their Sec. 7 rights, see 29 U.S.C. Sec. 158(b)(1)(A) (1976), and preventing union members from participating fully in union affairs, see id. Sec. 411(a)(2). Moreover, the Supreme Court read the labor laws as requiring a union to represent every employee in its bargaining unit fairly and adequately. Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 912-13, 17 L.Ed.2d 842 (1967); Steele v. Louisville & N.R.R., 323 U.S. 192, 202-03, 65 S.Ct. 226, 231-32, 89 L.Ed. 173 (1944).
 
 
 17
 In imposing these substantial fiduciary obligations on labor organizations, however, neither Congress nor the Court gave individual members license to avoid union rules designed to protect the welfare of the bargaining unit.
 
 
 18
 Congress, therefore, enacted the proviso to Sec. 8(b)(1)(A),[4] which reserves to unions the power to make reasonable rules regarding the retention and acquisition of membership. Allis-Chalmers, 388 U.S. at 181, 87 S.Ct. at 2007; 263 N.L.R.B. 984, 985 (1982) (plurality opinion). This power
 
 
 19
 is particularly vital when the members engage in strikes. The economic strike against the employer is the ultimate weapon in labor's arsenal for achieving agreement upon its terms, and "[t]he power to fine or to expel strikebreakers is essential if the union is to be an effective bargaining agent ...." Provisions in union constitutions and bylaws for fines and expulsion of recalcitrants, including strikebreakers, are therefore commonplace and were commonplace at the time of the Taft-Hartley amendments.
 
 
 20
 Allis-Chalmers, 388 U.S. at 181-82, 87 S.Ct. at 912-13 (footnotes omitted) (quoting Summers, Legal Limitations on Union Discipline, 64 Harv.L.Rev. 1049, 1049 (1951)).
 
 
 21
 In short, federal labor policy restricts the individual employee's absolute power to order his relations with management. Instead, it vests this power in a collective representative who must protect the interests of everyone in the bargaining unit. As a result,
 
 
 22
 [t]he complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.
 
 
 23
 Allis-Chalmers, 388 U.S. at 180, 87 S.Ct. at 2006-07 (emphasis added) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)).
 
 
 24
 B. The Scofield Test and Post-Resignation Discipline
 
 
 25
 In Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969), the Supreme Court articulated a three-part test for determining when a union disciplinary rule is reasonable. A union is free to enforce a properly adopted rule that (1) reflects a legitimate union interest, (2) impairs no policy that Congress has embedded in the labor laws, and (3) is reasonably enforced against union members. Id. at 430, 89 S.Ct. at 1158. The Court elaborated part (2) of the test by holding that it could not enforce a rule that "invades or frustrates an overriding policy of the labor laws." Id. at 429, 89 S.Ct. at 1157-58 (emphasis added).
 
 
 26
 The Board, see 263 N.L.R.B. at 986, suggests that this is a balancing test. It is not. Scofield sets out an orderly three-step analysis for determining when the Board may approve and the courts of appeals may enforce a union rule. Scofield says that the rule cannot be enforced unless it first meets all three conditions. Scofield does not invite either the Board or the courts to conduct an ad hoc weighing of the allegedly competing interests described in the main text of Sec. 8(b)(1)(A) on the one hand, and the proviso to Sec. 8(b)(1)(A) on the other.
 
 
 27
 For reasons that we offer below, we hold that the rule in question meets all three parts of the test and does not impair any congressional labor policy.
 
 
 28
 1. Legitimate union interest. Unions exist to pool the resources of employees so that the employees can bargain most effectively for improvements in wages, hours, and working conditions. For at least two reasons, post-resignation strikebreaking presents "the most appealing case for allowing unions to restrain the activities of those who have resigned." Note, Union Power to Discipline Members Who Resign, 86 Harv.L.Rev. 1536, 1549 (1973) [hereinafter cited as Note, Union Discipline].
 
 
 29
 First, post-resignation strikebreaking is a serious threat to a union's viability. It can set off a chain reaction capable of destroying the collective bargaining environment. If a union cannot punish the few employees who fail to honor the results of a strike vote, then those employees can escape their obligations to their colleagues in the majority simply by resigning and returning to work. If those members return to work and collect paychecks from the struck employer while the others remain on the picket line, some loyal union members will feel pressure to do the same. Eventually, a substantial number of defections could break the union and once again give the employer greater power to set the terms and conditions of employment. See Note, Union Discipline, supra, at 1549-51.
 
 
 30
 Second, members who participate in the strike vote and then fail to honor the result are breaching a promise to their colleagues. There is little point in taking a strike vote if the people who disagree with the outcome are free to resign anytime and escape its effects. "The strike vote itself involves mutual reliance on the promise to honor it." Note, Union Discipline, supra, at 1554; see 263 N.L.R.B. at 995 (Jenkins, Member, dissenting) ("In effect, the provision [for fining post-resignation strikebreakers] permits the Union to enforce its contract with each member--a contract which was freely entered into by all parties--and thereby protect its other members then exercising 'the ultimate weapon in labor's arsenal.' " (citation omitted)).
 
 
 31
 The problems that post-resignation strikebreaking poses, then, implicate the serious and legitimate interests of a union attempting to represent all its members.
 
 
 32
 2. Impairment of labor policy. The Board creates a false conflict between the employee's right to resign union membership and the union's interest in making rules regarding the acquisition and retention of membership.[5] These rights are preserved in Sec. 7 and Sec. 8(b)(1)(A) of the Act, respectively. Because both the employee's right and the union's interest are policies that have been "embedded" in the labor laws for over 35 years, neither can "impair" or "override" the other within the meaning of Scofield. They must--and do--coexist.
 
 
 33
 Consequently, we look beyond the non-existent conflict to the particular facts of this case. The Machinists simply fine the union member who resigns to take a job with the struck employer. The union constitution, however, does not force a member to remain a member forever or even for the remainder of the strike. Our previous finding that the rule constitutes "a restriction on a member's right to resign," Machinists I, 608 F.2d at 1222, means only that the rule puts some obstacles in the way of resignation. We do not dispute the employee's Sec. 7 right to resign from the union. But we disagree with the view that it is unreasonable for the union to penalize a member for breaching certain crucial obligations--here, the duty to refrain from strikebreaking.
 
 
 34
 Relying on language in NLRB v. Granite State Joint Board, 409 U.S. 213, 217-18, 93 S.Ct. 385, 387-88, 34 L.Ed.2d 422 (1972), the Board argues that the Machinists' rule works unfair hardship on an employee who votes to strike, walks out, and entertains second thoughts months later when he is unable to pay the bills and feed the family. We share the Board's concern but reject its remedy. If union members believe that a strike should end, they have several options. They may work within the union to persuade their colleagues, and the leadership, to end the walkout. They may resign from the union and take a job with another employer. Ultimately, they may elect new leaders who share their views, or even petition the Board to decertify the bargaining representative. But they may not betray their colleagues and expect to get away without paying a price for weakening the collective bargaining environment.
 
 
 35
 3. Reasonable enforcement. The Board contends that the union's rule is too harsh because it restricts resignation for a period beginning two weeks before the strike starts through the duration of the strike. We believe this restriction is not only reasonable, but also critical. First, these periods represent times when presenting a solid front to the employer is most important. Even the appearance of uncertain membership support may encourage the employer to be recalcitrant during negotiations. Note, Union Discipline, supra, at 1553-54.
 
 
 36
 Second, once a member decides to resign from a labor organization, the union has no effective means of discouraging him from working for the struck employer unless it can threaten to collect a fine. To a member prepared to resign, of course, the threat of expulsion carries no weight. Cf. Local 1255, International Association of Machinists & Aerospace Workers v. NLRB, 456 F.2d 1214, 1217 (5th Cir.1972) (union may condition readmission of expelled member on payment of fine for strikebreaking if such measure is the only way to collect the fine).
 
 
 37
 The Board argues, and we agree, that "the power of the union over the member is certainly no greater than the union-member contract." Granite State, 409 U.S. at 217, 93 S.Ct. at 387. But the terms of the contract before us condition the member's right to resign on his promise not to break the strike. If the member can escape his obligation by pleading, when the union attempts to collect the fine, that he is no longer part of the union, then the terms of this contract mean little.
 
 
 38
 Because the union has no other practical means of enforcing its rule against a member's resigning and returning to work for the struck employer, we believe that collecting fines from members who break the rule is a reasonable means of enforcement.
 
 CONCLUSION
 
 39
 For these reasons, we conclude that the union's rule fining strikebreakers is a reasonable restriction on the right to resign union membership.
 
 
 40
 Enforcement of the Board's order is DENIED.
 
 
 
 *
 Honorable Elbert P. Tuttle, United States Court of Appeals for the Eleventh Circuit, sitting by designation
 
 
 [1]
 This is the question the Supreme Court reserved in both Booster Lodge 405 v. NLRB, 412 U.S. 84, 88, 93 S.Ct. 1961, 1964, 36 L.Ed.2d 764 (1973) (per curiam), and NLRB v. Granite State Joint Board, 409 U.S. 213, 217, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972). These cases do not suggest that the Court would invalidate the rule in the present case, for neither Booster Lodge nor Granite State involved a union rule that expressly penalized a member for resigning union membership during a strike to resume working for the struck employer
 
 
 [2]
 Section 8(b)(1)(A) provides in relevant part:
 It shall be an unfair labor practice for a labor organization or its agents ... to restrain or coerce ... employees in the exercise of the rights guaranteed in [Sec. 7] of this title: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein ....
 29 U.S.C. Sec. 158(b)(1)(A) (1976). Section 7 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations ... and shall also have the right to refrain from any or all of such activities ....
 Id. Sec. 157.
 
 
 [3]
 We question the wisdom of calling the 30-day standard a "rule." Only two members concur in it; the other three oppose it. Yet the concurring and dissenting opinions refer to the two-member plurality as a "majority," see, e.g., 263 N.L.R.B. at 987 (Van de Water, Chairman & Hunter, Member, concurring); id. at 993 (Jenkins, Member, dissenting), and imply that the 30-day standard is now the law of the Board
 
 
 [4]
 See supra note 2
 
 
 [5]
 At least one Circuit, however, has agreed with the Board. See Pattern Makers' League of North America v. NLRB, 724 F.2d 57 (7th Cir.1983) (invalidating union rule fining members who resign to return to work for struck employer)