NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL
1547, AFL–CIO, Respondent.

No. 91–70120.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 4, 1992.

Decided Aug. 11, 1992.

Peter Winkler, N.L.R.B., Washington, D.C., for petitioner.

Helene M. Antel, Gen. Counsel, IBEW Local Union 1547, Anchorage, Alaska, for respondent.

Before: FARRIS, NORRIS and KOZINSKI, Circuit Judges.

PER CURIAM.

The Board petitions for enforcement of its order finding Local 1547 in violation of section 8(b)(1)(B) of the NLRA, 29 U.S.C. § 158(b)(1)(B).

Section 8(b)(1)(B) makes it an unfair labor practice for a union or its agents "to restrain or coerce ... an employer in the

selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." To establish a section 8(b)(1)(B) violation, all of the following must be shown: (A) that the union was seeking to unionize the employer's employees; (B) that the supervisor was engaged in section 8(b)(1)(B) activities; and (C) that the union discipline adversely affected the supervisor in the performance of his section 8(b)(1)(B) duties. *See NLRB v. IBEW, Local 340*, 481 U.S. 573, 585–89, 107 S.Ct. 2002, 2010–12, 95 L.Ed.2d 557 (1987); *NLRB v. IBEW, Local 77*, 895 F.2d 1570, 1573 (9th Cir.1990).

A. Substantial evidence supports the NLRB's finding that Local 1547 was seeking to unionize Veco's workers. First, two union representatives visited Elliott at the Veco job site. Union business agent Jim Morgan asked Elliott for a list of the employees at the job site and for permission to speak to those employees. When Elliott refused the request for the list and refused to allow the union to meet with the employees on company time, the other union representative threatened that if Elliott continued working for Veco, he would be denied work on other IBEW projects in the state. Second, at about this time the union authorized one of its members to attempt to obtain employment with Veco. The reason, as stated in an official union letter, couldn't be clearer: "IBEW is *presently trying to organize* said company" (emphasis added).

■ The union letter is evidence of the union's subjective intent to organize; the visit to Elliott at the job site is a "specific overt act[ ]," *Local 340*, 481 U.S. at 579 n. 3, 107 S.Ct. at 2007 n. 3, to further that intent.[1] A reasonable trier of fact could draw the inference from these two data that IBEW was "seek[ing] to establish" a collective bargaining relationship with Veco. *See id.* at 590, 107 S.Ct. at 2012–13. Substantial evidence means only " 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evi-

dence.' " *Local 77*, 895 F.2d at 1573 (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir. 1987)). While we might have come to a different conclusion, it is not our place to second-guess the agency charged with enforcing the labor laws. Evidence of union pressure, coupled with internal union correspondence indicating its intent to unionize Veco, could convince a reasonable person that exactly that was going on.

■ B. The union concedes that Elliott was charged with section 8(b)(1)(B) duties. See Stipulation of Facts at 2 ("Elliott was employed as a job superintendent and as such he had authority, which he exercised, to hire, discharge and discipline employees. In addition he acted as a representative of the Employer in adjusting employee grievances."). Although the statute speaks of "collective bargaining" and "adjustment of grievances," there need not be a union contract: A supervisor who performs analogous duties for a non-union employer may also be deemed a supervisor charged with section 8(b)(1)(B) duties. *See, e.g., Local Union 60 v. NLRB*, 941 F.2d 1326, 1333 (5th Cir.1991); cf. 29 U.S.C. § 152(11) (supervisor is "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees").

■ C. The question, therefore, is whether substantial evidence supports the Board's determination that the union action coerced the employer in its choice of supervisor. The focus of section 8(b)(1)(B) is the *employer:* It protects employers from union tactics that may affect its choice of supervisors, and the Supreme Court has recognized that pressure on supervisors indirectly coerces employers. *See American Broadcasting Co. v. Writers Guild of America, West, Inc.*, 437 U.S. 411, 429, 98 S.Ct. 2423, 2433–34, 57 L.Ed.2d 313 (1978). The question always remains whether the union's action influences the employer in its choice of supervisor. "[W]henever such discipline may adversely affect the supervi-

---

1. While the *Local 340* footnote mentions certain common tactics, there is no indication that the list was meant to be exhaustive or that more than one "overt act" need be shown.

sor's conduct in his capacity as a grievance adjustor or collective bargainer ... the employer would be deprived of the full services of his representatives and hence would be restrained and coerced in his selection of those representatives." *Id.*

■ In this case, it's conceded that Elliott performs "8(b)(1)(B) activities"—grievance adjustment and the like. A finding of liability is appropriate, therefore, if the challenged union action had "an adverse effect on [Elliott's] future performance of that same section 8(b)(1)(B) duty." *Local 340*, 481 U.S. at 585, 107 S.Ct. at 2010. The Board found that it did:

> The [union's] initial threats aimed at conscripting Elliott into assisting in the campaign to organize the employees whose grievances he would be adjusting if the campaign succeeded, coupled with the notice to him of union charges (albeit not expressly tied to his refusal to aid the campaign), triggered his departure as the Employer's 8(b)(1)(B) representative on that project. The fines imposed in June were simply the final effectuation of a course of conduct calculated, inter alia, to exert an adverse effect on Elliott as an adjuster of grievances from employees whom the [union] was seeking to represent.

*IBEW Local 1547 (Veco, Inc.)*, 300 NLRB No. 144, at 3 (Dec. 31, 1990).

Substantial evidence supports the Board's determination. Put simply, the union threats and disciplinary action caused Elliott to leave his job with Veco, which undoubtedly affected his ability to act as Veco's representative; the employer was thereby coerced. See *Local Union 60*, 941 F.2d at 1332–33 & n. 1 (union's fining supervisor-members for working for a non-union employer violated section 8(b)(1)(B)); *see also Maritime Overseas Corp. v. NLRB*, 955 F.2d 212, 221–22 (4th Cir.1992) (discussing coercive effects of union fines); *American Broadcasting Co.*, 437 U.S. at 429, 98 S.Ct. at 2434 ("employer [can] be coerced or restrained within the meaning of § 8(b)(1)(B) not only by ... direct actions aimed at him but also by debilitating discipline imposed on his collective-bargaining or grievance-adjustment representative"). It is irrelevant that Veco did not have a collective bargaining agreement with Local 1547, as the *Local 340* Court recognized when it held that the union must have *or seek* a bargaining relationship. *See also Local Union 60*, 941 F.2d at 1333 ("an employer can be illegally coerced or restrained under § 8(b)(1)(B) when no collective bargaining agreement is in place").

The Board's order is ENFORCED.

NORRIS, Circuit Judge, dissenting:

I respectfully dissent because the facts in this case are insufficient to establish a § 8(b)(1)(B) violation.

I

Veco, Inc. is engaged in the oil field construction and maintenance business. In August 1985, Local 1547 authorized three of Veco's employees, including Randal Prater, to organize the employees of Veco on behalf of the union. The three employees were laid off at the end of August, allegedly because of their organizing activity. In April 1986, Local 1547 again authorized Prater to attempt to organize Veco's employees. Prater did not secure re-employment with Veco until early June, at which time the union granted him permission to work for Veco without continuing his organizing efforts, apparently because of the scarcity of work in the region. Between June 1986 and April 1987, the union did not engage in any organizing efforts directed at Veco. Sometime in April 1987, however, Local 1547 began a formal organizing campaign.

Veco employed William O. Elliott as a job superintendent at its site in Prudoe Bay, Alaska from February to April 1986. Elliott had authority to hire, discharge, and discipline employees and acted as Veco's representative in adjusting employee grievances. In March 1986, a Local 1547 member working for a different employer filed internal union charges against Elliott, who had been a longstanding member of Local 1547. These charges resulted in a visit to Elliott from two representatives of the un-

ion, including business agent Jim Morgan. During the course of the conversation, Morgan asked Elliott for a list of the employees at the job site and for permission to speak to those employees. When Elliott refused the request for the list and refused to allow the union to meet with the employees on company time, the other union representative threatened that if Elliott continued working for Veco, he would be denied work on other IBEW projects in the state.

In mid-April, Elliott received a message from his home in Oregon that there was a registered letter from the union waiting for him. Surmising that it was a union charge against him, he immediately returned home and never returned to his job with Veco. In June, the union's trial board decided that Elliott had violated certain provisions of the union's constitution and bylaws by working for a non-union employer.[1] Elliott was fined $5,000 with the understanding that $2,500 would be suspended if Elliott refrained from engaging in similar violations for one year.

An administrative law judge found that Local 1547 had violated NLRA § 8(b)(1)(B), which makes it an unfair labor practice for a labor organization or its agents "to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances," by fining Elliott. 29 U.S.C. § 158(b)(1)(B). The ALJ recommended that the NLRB order Local 1547 to cease and desist from this and similar violations and to rescind the fine levied against Elliott and expunge from its records all documents relating to the fine. The NLRB adopted the ALJ's recommended order and filed a petition for enforcement with this court. We have jurisdiction under 29 U.S.C. § 160(e).

## II

We uphold decisions of the NLRB if substantial evidence supports its findings of fact and if it has correctly applied the law. *NLRB v. IBEW, Local 77*, 895 F.2d 1570, 1573 (9th Cir.1990). We consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the agency's decision. *Id.* We must defer to the NLRB's conclusions when "there is 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'" *Id.* (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987)).

Section 8(b)(1)(B) of the Act makes it an unfair labor practice for a labor organization or its agents "to restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances." 29 U.S.C. § 158(b)(1)(B). In the sentence immediately preceding subsection (B), there is a proviso stating that "this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein." 29 U.S.C. § 158(b)(1)(A). While this proviso appears as part of section (b)(1)(A) of the Act, it applies to section (b)(1)(B) as well because "[s]ection 8(b)(1)(B) must be ... interpreted to allow unions to enforce internal union rules that impair no labor policy." *NLRB v. IBEW, Local 340*, 481 U.S. 573, 592 n. 16, 107 S.Ct. 2002, 2013 n. 16, 95 L.Ed.2d 557 (1987).[2]

---

1. Elliott was found guilty of violating several provisions of the IBEW Constitution which, among other things, prohibit a member from "[e]ngaging in any act or acts which are contrary to the member's responsibility toward" the union, and "working for, or on behalf of, any employer ... whose position is adverse or detrimental" to the union. He was also found to be in violation of a local union bylaw, which prohibits a member from "solicit[ing] employment or hir[ing] himself out directly to any employer without permission of the Business Manager."

2. *See also Scofield v. NLRB*, 394 U.S. 423, 430, 89 S.Ct. 1154, 1158, 22 L.Ed.2d 385 (1969) ("[Section] 8(b)(1) leaves a union free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule.").

At its essence, this dispute is about the application of a generally applicable, and wholly legitimate, union rule that prohibits members from working for employers with whom the union does not have a collective bargaining relationship. Elliott, a union member, accepted employment with a company whose employees were not unionized, and a fellow union member filed an internal union charge against him on this basis. This presented Elliott with a choice: he could either resign from the union or quit his job with Veco. Elliott chose the latter.

The only difference between the circumstances of this case and other routine exercises of union discipline is that Elliott was employed in a supervisory capacity at Veco. But this fact alone is not sufficient to make out a violation under § 8(b)(1)(B). The Supreme Court has established a three-fold test for determining whether a union's discipline of a supervisor-member violates this provision. First, the union must have a collective bargaining relationship with the employer or seek to establish one in the future. *Local 340*, 481 U.S. at 590, 107 S.Ct. at 2012–13; *Local 77*, 895 F.2d at 1573. Second, the supervisor must be "engaged in § 8(b)(1)(B) activities—that is, collective bargaining, grievance adjustment, or some other closely related activity." *Local 340*, 481 U.S. at 586, 107 S.Ct. at 2010; *Local 77*, 895 F.2d at 1573. And third, the union's rules or discipline must adversely affect the supervisor in the performance of his § 8(b)(1)(B) duties. *Local 340*, 481 U.S. at 585, 107 S.Ct. at 2010; *Local 77*, 895 F.2d at 1573. All three of these factors must be satisfied before a union may be found in violation.

I dissent because I believe the majority has misapplied each of the three elements of this test to the facts of this case.

## A

First of all, the protections of § 8(b)(1)(B) should never have been triggered at all because Local 1547 neither had a collective bargaining relationship with Veco, nor is there sufficient evidence in the record to conclude that they were "seek[ing] to establish" such a relationship. *See Local 340*, 481 U.S. at 590, 107 S.Ct. at 2012; *Local 77*, 895 F.2d at 1573. The requirement that a union have, or meaningfully seek to have, a collective bargaining relationship with the employer ensures that § 8(b)(1)(B)'s protections only apply when the effects of union discipline on a supervisor's exercise of his § 8(b)(1)(B) duties are more than merely speculative. The union's discipline of a supervisor-member does not violate § 8(b)(1)(B) unless the supervisor-member can "reasonably expect that he or she will be subject to discipline for the *manner* in which those [§ 8(b)(1)(B)] duties are performed in the future." *Local 340*, 481 U.S. at 590, 107 S.Ct. at 2012 (emphasis in original). More is required than evidence of the union's hope of establishing a collective bargaining relationship sometime in the future. There must be "evidence of specific overt acts such as picketing, handbilling, making statements of interest to the employers, or passing out opposition cards to find a desire to represent these particular employees." *Id.* at 579 n. 3, 107 S.Ct. at 2007 n. 3 (quoting *NLRB v. IBEW, Local 340*, 780 F.2d 1489, 1492–93 (9th Cir.1986)).

We must defer to the NLRB's conclusion that Local 1547 was seeking a collective bargaining relationship with Veco only if there is evidence that reasonable minds might accept as adequate to support that conclusion. *Local 77*, 895 F.2d at 1573. In this case, the evidence falls short. It is undisputed that Local 1547 did not begin a formal campaign to organize Veco's employees until April 1987, well after Elliott had been disciplined by the union. Local 1547's efforts to organize Veco's employees prior to April 1987 were highly tentative at best, and had not gone beyond a preliminary planning stage. In August 1985, Local 1547 had authorized three of its members to try to organize Veco's employees, but these efforts were unsuccessful and the union members were laid off by Veco shortly thereafter. In April 1986, Local 1547 again authorized one of its members to try to organize Veco's employees, but this member did not obtain a job with Veco until June 1986, *after* the union had relieved him of his obligation to try to

organize Veco.[3] The only other evidence that Local 1547 was seeking a collective bargaining relationship with Veco at the time of the alleged § 8(b)(1)(B) violations was the meeting between two representatives of Local 1547 and Elliott in March 1986, at which the representatives asked Elliott for a list of Veco employees and for permission to speak to those employees. This evidence is *de minimis* at best, and cannot reasonably support the NLRB's conclusion that Local 1547 was seeking a collective bargaining relationship with Veco at the time Elliott was disciplined.

## B

Second, even if it were true that Local 1547 was seeking to organize Veco's employees during the relevant time period, the NLRB's claim would still fail under the second prong of the test because, although Elliott had responsibility for adjusting personal grievances of employees, his activities did not qualify as grievance adjustment under the "narrow purpose and scope of § 8(b)(1)(B)." *Local 340*, 481 U.S. at 589 n. 12, 107 S.Ct. at 2012 n. 12. As the Supreme Court has indicated, the protections of § 8(b)(1)(B) were not meant to extend to *all* supervisors who happen to adjust employee grievances, but only to those who do so in the context of a collective bargaining arrangement. *See id.* In the opening paragraph of its opinion in *Local 340*, the Supreme Court defined the grievance adjustment activity that is covered by § 8(b)(1)(B) as the adjustment of "contractual grievances," 481 U.S. at 573, 107 S.Ct. at 2003, and the Court quoted approvingly from a scholarly treatise describing the term "grievance" as a " 'disput[e] over the

application of the contract.' " *Id.* at 589 n. 12, 107 S.Ct. at 2012 n. 12 (quoting D. Bok & J. Dunlop, Labor and the American Community 220 (1970)).[4] The Court's repeated emphasis on the contractual dimension of grievance adjustment indicates that a supervisor-employee is not a grievance adjuster within the meaning of § 8(b)(1)(B) unless the employer is a signatory to a collective bargaining agreement.

This rule is also consistent with the underlying purpose of § 8(b)(1)(B), which, in the context of grievance adjustment, is to prevent unions from using their disciplinary powers to pressure supervisors into adjusting grievances in a manner that favors the employee union members. Since supervisors who adjust grievances under a collective bargaining agreement must "deal with the same union which [is] considering ... their personal sanctions," there is a substantial danger that they "might be tempted to give the union side of a grievance a more favorable slant while the threat of discipline remained." *American Broadcasting Cos. v. Writers Guild*, 437 U.S. 411, 434, 435, 98 S.Ct. 2423, 2436, 2437, 57 L.Ed.2d 313 (1978). But where the employees are not union members, as in this case, a union has no incentive to influence the way a supervisor performs grievance adjustment duties. *Local 340*, 481 U.S. at 590, 107 S.Ct. at 2012. Accordingly, no rational purpose would be served by extending § 8(b)(1)(B) to cover non-contractual grievance adjustment activities.

Therefore, because the grievance adjustment duties Elliott performed at Veco took place in the absence of a collective bargaining agreement, I would hold that Elliott's activities were not covered by § 8(b)(1)(B).[5] While I recognize that the Fifth Circuit has

---

**3.** The majority makes much of a union letter which evidenced Local 1547's desire to organize Veco when it authorized Prater to again seek employment with Veco. But, apparently, this desire was abandoned, or at least dampened, by the time Prater started working for Veco. Indeed, there is no evidence in the record to suggest that Prater engaged in any organizing activity at all during the approximately 10 days he worked for Veco in June 1986.

**4.** Furthermore, in *Local 340* the Court specifically distinguished its earlier holding in *American Broadcasting Cos. v. Writers Guild*, 437 U.S.

411, 98 S.Ct. 2423, 57 L.Ed.2d 313 (1978) (*ABC*), on the ground that the adjustment of grievances in *ABC* took place in the context of an existing contractual relationship. *Local 340*, 481 U.S. at 590–91 n. 14, 107 S.Ct. at 2012–13 n. 14.

**5.** The NLRB did not reach the question whether Local 1547's actions adversely affected Elliott in the performance of collective bargaining duties. ER at E:3 n. 3. Nor does the NLRB's General Counsel argue in this petition for enforcement that Elliott performed collective bargaining duties. Accordingly, we need not reach this question.

reached a contrary conclusion on this issue, *see Local Union 60 v. NLRB*, 941 F.2d 1326, 1333 (5th Cir.1991), I believe that the narrower rule I have stated comports more faithfully with Supreme Court precedent and with other related provisions of the Act. *See, e.g.*, 29 U.S.C. §§ 171(c), 173(d).

### C

Finally, even if I were to accept the Fifth Circuit's approach in *Local Union 60* that § 8(b)(1)(B) applies to non-contractual grievance adjustment, the NLRB's position would still fail because the union's actions in this case did not adversely affect Elliott in the performance of his § 8(b)(1)(B) duties.

Union discipline violates § 8(b)(1)(B) only if it has "an adverse effect on the supervisor-member's future performance of *that same § 8(b)(1)(B) duty.*" *Local 340*, 481 U.S. at 585, 107 S.Ct. at 2010 (emphasis added). It is undisputed here that the warnings and disciplinary action directed at Elliott by the union were neither directed at, nor motivated by, his performance as a grievance adjuster. According to the majority, however, the reason that Local 1547's discipline "adversely affected" Elliott in the performance of his § 8(b)(1)(B) duties was because it ultimately caused him to leave his job with Veco. This reasoning is based on a misapprehension of the "adverse effect" test, and has been rejected by the Supreme Court. In *Local 340*, the Court recognized that union discipline will often affect a supervisor's willingness to serve in a managerial capacity, but held that this "minimal effect on an employer's selection of § 8(b)(1)(B) representatives is insufficient to support a § 8(b)(1)(B) charge." *Id.* at 593, 107 S.Ct. at 2014. Section 8(b)(1)(B) was intended to prevent a union engaged in a long-term relationship with an employer from dictating the employer's choice of representatives for the purpose of grievance adjustment or collective bargaining. *See* S.Rep. No. 105, 80th Cong., 1st Sess., p. 21 (1947). "It was not intended to prevent enforcement of uniform rules that may occasionally have the incidental effect of making a supervisory position less desirable." *Local 340*, 481 U.S. at 591, 107 S.Ct. at 2013.

I recognize that the narrow reach of § 8(b)(1)(B) may leave a conflict-of-loyalties problem in cases where a supervisor's union obligations may conflict with his employer's expectations. However, the Court has indicated that § 8(b)(1)(B) was not intended to solve the general problem of supervisor-member conflict of loyalties. *Local 340*, 481 U.S. at 583–84, 107 S.Ct. at 2009–10; *Florida Power & Light Co. v. IBEW, Local 641*, 417 U.S. 790, 807–13, 94 S.Ct. 2737, 2746–49, 41 L.Ed.2d 477 (1974). Congress addressed this problem through a different route, by exempting supervisors from the definition of "employee." *Florida Power*, 417 U.S. at 807–08, 94 S.Ct. at 2746. Thus, an employer "is at liberty to demand absolute loyalty from his supervisory personnel by insisting, on pain of discharge, that they neither participate in, nor retain membership in, a labor union." *Id.* at 812, 94 S.Ct. at 2748. An employer who elects not to do so may have a supervisor with divided loyalties, but "[t]he employer's problem ... is of its own making." *Local 340*, 481 U.S. at 594, 107 S.Ct. at 2014.

For each of the foregoing reasons, I would deny enforcement of the Board's order.